**Fernando Eros CARO, Petitioner–Appellant,**

v.

**Arthur CALDERON, Warden, Respondent–Appellee.**

**No. 96–99019.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1998.

Decided Oct. 27, 1998.

Amended Jan. 11, 1999.

---

Joseph C. Spero, Keith Evans–Orville, Coblentz, Patch, Duffy & Bass, LLP, San Francisco, California, for the petitioner-appellant.

Dane R. Gillette, Senior Assistant Attorney General, San Francisco, California, for the respondent-appellee.

Before: PREGERSON, FERGUSON and KLEINFELD, Circuit Judges.

FERGUSON, Circuit Judge:

Fernando Caro appeals the District Court's dismissal of his writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] In this opinion, we consider whether Caro was entitled to an evidentiary hearing on his claim that counsel's failure to investigate the combined effects of Caro's extraordinary exposure to neurotoxicants, neurological impairments, and personal background constituted ineffective assistance of counsel at the penalty phase trial. We conclude that Caro is entitled to an evidentiary hearing and remand to the district court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Caro was convicted on October 16, 1981, of two counts of first degree murder, the kidnapping of one of the victims, and two counts of assault with intent to commit murder. On December 10, 1981, a sentencing jury returned a verdict of death. On October 6,

1. By a memorandum disposition filed this date we have concluded that petitioner is not entitled to habeas corpus relief on the guilt phase issues raised in his petition.

1988, the California Supreme Court set aside one of the special circumstance findings as duplicative, but otherwise affirmed the judgment. *People v. Caro*, 46 Cal.3d 1035, 251 Cal.Rptr. 757, 761 P.2d 680 (1988). Caro subsequently filed two writs of habeas corpus with the California Supreme Court. The court denied both writs. Caro then filed a writ of habeas corpus in the United States District Court for the Northern District of California. The District Court denied Caro's request for an evidentiary hearing, granted summary judgment for the State, and dismissed the petition.

Caro is of Mexican–American and Yaqui Indian heritage. He was raised in a racially divided rural community in conditions of abject poverty. The oldest son of farm laborers, Caro spent most of his childhood living in a shack surrounded by livestock yards and agricultural fields. The house had no running water or indoor plumbing and, due to its proximity to the livestock yards, was filled with flies and other insects that "made the sky black." During the summer, Caro and his family joined the stream of migrant farm workers. The family slept in fields, open tents, or along the road, sometimes using empty crates as beds. Caro worked alongside the adults as soon as he was able to walk.

Caro's role as the oldest son of a traditional family meant that his parents' expectations of him were higher than those for his siblings. Declarations from his mother, sister, and other relatives all indicate that Caro was the most severely beaten of his brothers and sisters because he was the oldest. Both parents beat Caro severely throughout his childhood, hitting him with closed fists, sticks, belts, tools, and boards, and kicking him with work boots.

Caro suffered severe head injuries as a child. His mother reports that he was born with a three inch lump on his head due to the use of forceps during his difficult delivery. At the age of three, Caro was struck by a car and fell back and hit his head. A water cooler fell on his head that year as well.

Caro also suffered from acute and chronic exposure to neurotoxic chemicals throughout his life, some of which have been documented to cause otherwise inexplicable aggressive behavior. Caro's family used water laden with pesticides both at home and in the fields for drinking, bathing, and cleaning. His family used insecticide on a daily basis to fight the insect infestation at home. At the age of one and a half, Caro drank a bottle of Clorox and went into convulsions, turning blue and foaming at the mouth, for four to six minutes. Throughout his childhood, Caro worked and played in fields covered with pesticides. One day, while playing on a tank of ammonia, Caro peered into the tank and lost consciousness from the fumes.

During high school, Caro worked as a "flagger"—someone who stands in the fields to indicate to the crop duster where to dump his load of pesticides. Caro was denied the protective clothing his supervisors wore as they watched him mix and load the chemicals prior to dumping. Because he had no access to a shower or time to change clothes before school, Caro would spend all day in pesticide-drenched clothes. The pungent smell of the pesticides earned him the nickname "Stinky" among his classmates.

As an adult, Caro worked for the two years prior to his arrest as a maintenance worker at a corporation that produced toxic pesticides. One of Caro's primary tasks was to clean the air ventilation system and the mixing and heating equipment. Workers were not given protective respiratory devices. Rather, they were tethered with a rope to a waist belt so they could be pulled out of the system when they lost consciousness. Workers also cleaned contaminated equipment, holding pieces of equipment in vats of solvents with their hands. Plastic protective gloves regularly tore during this work. Caro volunteered to break down five or six transformers containing polychlorinated byphenyls ("PCBs"), formerly banned from use. Caro also formed part of the plant's Emergency Response Team, responding to at least three accidents during his employment. During one of these accidents, the cloud of Parathion that was released burned the paint off the walls.

## STANDARD OF REVIEW

The District Court's denial of an evidentiary hearing is reviewed for an abuse of

discretion. *Swan v. Peterson,* 6 F.3d 1373, 1384 (9th Cir.1993) (citing *Greyson v. Kellam,* 937 F.2d 1409, 1412 (9th Cir.1991)).

## DISCUSSION

■ Caro is entitled [2] to an evidentiary hearing if (1) he has alleged facts that, if proved, would entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts. *See Turner v. Marshall,* 63 F.3d 807, 815 (9th Cir.1995) (quoting *Tinsley v. Borg,* 895 F.2d 520, 530 (9th Cir.1990)); *see also Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *rev'd on other grounds by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Siripongs v. Calderon,* 35 F.3d 1308, 1314 (9th Cir.1994).

■ In order to demonstrate that his counsel was ineffective, Caro must show that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Effectiveness must be judged as of the time the legal services were rendered so as to minimize the distortions of hindsight. *Bonin,* 59 F.3d at 835. In addition, Caro must show that the deficient performance rendered the results of his trial unreliable or fundamentally unfair. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *see also Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

■ Failure to investigate a defendant's organic brain damage or other mental impairments may constitute ineffective assistance of counsel. *See, e.g., Hendricks v. Calderon,* 70 F.3d 1032, 1043–44 (9th Cir. 1995); *Evans v. Lewis,* 855 F.2d 631, 637–38 (9th Cir.1988). In addition, this Court has recognized that the failure to present evidence necessary to bridge a cultural gap may constitute ineffective assistance of counsel. *Siripongs,* 35 F.3d at 1316. Counsel have a duty to make a reasonable investigation such

that they are able to make informed decisions about how best to represent their clients. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994). "Thus, we have found counsel ineffective where he neither conducted a reasonable investigation nor made a showing of strategic reasons for failing to do so." *Sanders,* 21 F.3d at 1456.

■ Caro has presented several declarations from experts stating that no evaluation of his mental capacities is complete without information concerning Caro's exposure to neurotoxicants as well as his personal background. Caro was examined by four experts prior to trial, including one medical doctor, a psychologist, and a psychiatrist. None of the experts indicated that Caro suffered from a mental impairment severe enough to constitute legal insanity or diminished capacity. Nevertheless, the medical doctor who examined Caro prior to trial has since declared that, had he known of Caro's extraordinary exposure to pesticides, the severe physical, emotional, and psychological abuse he suffered as a child, and his social and cultural history, he would have testified that Caro had a diminished mental capacity. In addition, the competence of the psychiatrist is subject to question, since he prompted a suicide attempt by telling Caro that he should have the right to take his own life. Finally, none of the experts were neurologists or toxicologists and none conducted the neurological testing needed to evaluate the effects that the pesticides and chemicals had on Caro's brain.

■ Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert. Counsel in this case was aware of Caro's extraordinary acute and chronic exposure to neurotoxicants, and yet he failed to consult either a neurologist or a toxicologist, experts on the effects of the chemical poisoning. In

---

**2.** The Anti–Terrorism and Effective Death Penalty Act's amendments to 28 U.S.C. § 2254 do not apply retroactively. *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *see*

*also Jeffries v. Wood,* 103 F.3d 827, 827 (9th Cir.1996) (en banc). We therefore apply pre–1996 law.

addition, he failed to provide those experts who did examine Caro with the information necessary to make an accurate evaluation of Caro's neurological system.

The conclusion of the dissent is based upon a misunderstanding of the difference in the mental and medical issues discussed in *Williams v. Calderon,* 52 F.3d 1465 (9th Cir. 1995), and those presented here. In *Williams,* referring to the guilt phase of the trial, we stated that "no psychiatrist would have made a difference." *Id.* at 1470. We have set forth in our memorandum disposition which pertains only to the guilt phase of Caro's trial that the lack of medical evidence discussed in this opinion was not ground for granting the writ in the guilt phase.

However, this case is now about the sentencing phase of Caro's trial and the effect in that phase of Caro's chemically-induced neurological damage. It has been demonstrated that such poisoning causes inexplicable and aggressive behavior. No amount of disdain for the Yale Medical School can change the fact that the jury here was never presented with the most important evidence of mitigation—the chemical poisoning of Caro's brain. Furthermore, the dissent fails to understand the difference between chemical poisoning causing brain damage which results in aggressive behavior and the death of a brain cell caused by the lack of oxygen as the result of a stroke which does not cause aggressive behavior. As the dissent does not understand that difference, then it is clear that a jury must have such a difference explained by experts. It may be the difference between life and death.

It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase. "The Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy." *Hendricks,* 70 F.3d at 1044 (quoting *Deutscher v. Whitley,* 884 F.2d 1152, 1161 (9th Cir.1989), *vacated and remanded on other grounds,* 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991)); *see also Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

The government argues that Caro suffered no prejudice during the sentencing phase because the jury was presented with extensive mitigating evidence, there was overwhelming evidence of Caro's guilt, and aggravating factors weighed against him. The sentencing jury was aware that Caro was beaten and suffered head injuries as a child. The jury also knew that Caro worked as a flagger in high school and at an agricultural chemical company as an adult. The jury did not, however, have the benefit of expert testimony to explain the ramifications of these experiences on Caro's behavior. Expert evidence is necessary on such issues when lay people are unable to make a reasoned judgment alone.

In addition, this Court has held that overwhelming evidence of guilt does not ameliorate the failure to present mitigating evidence at the penalty phase. *Hendricks,* 70 F.3d at 1044. "The determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors [in California] give the jury broad latitude to consider amorphous human factors, to weigh the worth of one's life against his culpability." *Id.* The type of mitigating evidence omitted here is precisely the type most likely to affect a jury's evaluation of the punishment Caro should receive.

*Babbitt v. Calderon,* 151 F.3d 1170 (9th Cir.1998), is distinguished from this case. *Babbitt* is a case in which the defendant suffered from post traumatic stress disorder because of his experiences in Vietnam. *Id.* at 1173. At trial, Babbitt presented testimony from two experts concerning his condition. *Id.* Also, at the habeas proceeding in district court, trial counsel stated that he had hired an experienced death penalty investigator who conducted a thorough investigation into Babbitt's history and found every piece of relevant evidence regarding Babbitt's background that could bear in mitigation. *Id.* at 1176. The court held that, with respect to both guilt and penalty phases, counsel's failure to pursue further evidence that was largely cumulative of the testimony given at the trial was not constitutionally deficient. *Id.* at 1174, 1176.

All that is entirely different from Caro's case. Caro's is not a case of stress caused by a stressful history; rather, it is a case of chemical poisoning of the brain causing aggressive behavior. Unlike Babbitt's case, not a single piece of evidence of Caro's condition was introduced at trial. Counsel, although aware of the acute and chronic exposure to neurotoxic chemicals, did nothing with regard to acquiring experts on the effects of chemical poisoning. In addition, counsel failed to provide those who did examine Caro with the information that he had. All counsel had to do was ask the question "What did all that extraordinary exposure to chemicals do to his brain?" And then, in order to find the answer, he merely had to address the question to either a neurologist or a toxicologist. Similarly, he could have asked the question to the experts he did retain who would have then told him that he needed to consult others.

This cases differs from *Babbitt* where "[t]here was no need for counsel to seek out [additional experts] independently." *Id.* at 1174. It is clear that, contrary to what the dissent believes, *Babbitt* and this case are not based "on materially similar facts," *see ante* at newly added dissent footnote 1, because every piece of relevant evidence in mitigation was not presented here at trial.

We also held in *Babbitt* that even if there was deficient performance of counsel that the defendant could not show prejudice. *Id.* at 1175–76. In Caro's case, on the issue of prejudice, the dissent does not state that the case for prejudice does not exist, only that it is "weak." *Ante,* at 1177 n. 2. It is submitted that "weak" prejudice is prejudice nonetheless, particularly when the jury was not presented with the single most important evidence of mitigation—chemical brain poisoning causing aggressive behavior.

Finally, with reference to footnote one in the revised dissent, robust dissent always has been universally recognized as an essential part of the judicial process as it requires judges to focus with particularity upon those matters in the case that divide them. The majority welcomes the intensity of the dissent in this case. However, it is difficult to believe that the dissent would base its test for determining constitutional Sixth Amendment competency of attorneys on its personal unsubstantiated belief in what "good lawyers" often do, rather than on what actually happened in this case.

It must be understood that Caro's brain injuries and poisoning are different from the facts of any other case that has been called to the court's attention. Caro suffered severe head injuries at birth and afterwards. As a child, he drank and bathed in water contaminated with poisons and then, in high school, worked in fields where he was drenched in pesticides. As an adult, he worked in vats filled with toxic pesticides without the benefit of any protective breathing devices. A lawyer who knows of but does not inform his expert witnesses about these essential pieces of information going to the heart of the case for mitigation does not function as "counsel" under the Sixth Amendment, let alone as a "good lawyer." Furthermore, a lawyer whose expert witness advises his client to commit suicide must engage in what the dissent pejoratively labels "witness shopping."

Despite Caro's efforts to obtain an evidentiary hearing on this issue, neither the district court nor the state courts have reliably found the facts relevant to this claim. Caro is therefore entitled to an evidentiary hearing to determine whether he suffered brain damage as a result of his exposure to neurotoxicants and his personal background. If so, counsel's failure to investigate will have rendered the results of Caro's penalty phase trial unreliable.

The judgment of the district court denying the petition for writ of habeas corpus as it pertains to the sentencing phase of the petition is remanded to the district court for an evidentiary hearing as set forth in this opinion.

REMANDED.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

Today's decision is in conflict with our decision in *Williams v. Calderon,* 52 F.3d

1465 (9th Cir.1995).[1] In *Williams*, we affirmed denial of the writ, despite counsel's failure to examine his client's past medical records or seek appointment of an independent psychiatrist, and despite five psychiatrists' declarations submitted with the petition saying that he suffered from diminished capacity when he killed three people after raping one of them. We said that the evidence of Williams' "intent to kill and his

---

1. All three of us on the panel missed *Babbitt v. Calderon*, 151 F.3d 1170 (9th Cir.1998). It came down as we were finishing our responses to each others' draft opinions in this case. The petition for rehearing has educated us about *Babbitt*. We now have a duty either to follow *Babbitt* or distinguish it.

I think we cannot distinguish it and must follow it. Our decision in *Caro* cannot be reconciled with the earlier decision in *Babbitt*. We are obligated to conform our decision to precedent.

*Babbitt* and *Caro* reach opposite conclusions on materially similar facts. The defendants in both capital cases claimed ineffective assistance of counsel. In both cases defense counsel consulted with appropriate medical experts. In both, those experts did not refer defense counsel to other experts (in *Babbitt* post-traumatic stress disorder experts and in *Caro* pesticide toxicity brain disorder experts) that habeas counsel argued should have been consulted. In both cases, habeas counsel claimed that defense counsel at trial should have provided his medical experts with additional information that the experts did not ask for. In both, habeas counsel argued that more should have been brought out about the family circumstances of the defendant. *Babbitt* holds that an evidentiary hearing is not required, *Caro* holds that one is. The factual distinctions drawn by the majority are immaterial.

The relevant principle, applicable equally to both cases, is that where the medical experts counsel retained "did not state that they required the services of additional experts," there "was no need for counsel to seek them out independently." *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir.1998). And *Babbitt* rejects habeas counsel's focus "on what evidence his counsel could have obtained [regarding family and social background] rather than focusing on whether his counsel's investigative efforts were reasonable." *Id.* at 1175.

Good lawyers do not simply read the experts' advertisements in the legal newspapers until they find an expert who will say the right thing, and then use him. An expert who is not believed frequently sinks a case. Good lawyers often consult experts they know and trust, and consider their advice before going further. The majority opinion has the unintended, undesirable consequence of creating a Constitutional requirement that defense lawyers engage in inappropriate witness shopping.

The majority evidently misreads my view on prejudice. As explained below, I think there was none, even if Caro's lawyers' work had fallen below the *Strickland* standard, which it did not.

The majority suggests that I should not be permitted to say what a good lawyer would do, but then opines freely about what, in its opinion, any lawyer functioning as 'counsel' guaranteed by the Sixth Amendment (which is to say, *a fortiori*, any good lawyer) would do. Obviously all of us should and properly do use our experience as lawyers and judges to consider what competent lawyers do and whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The evidence about Caro's chemical exposure was massive, and brought out fully to the jury. Caro's experts had access to it. Dr. Benson employed a clinical social worker who gave him an extensive history of Caro's childhood and adolescence. Dr. Benson now swears that Caro's exposure to pesticides is a "necessary predicate" to forming a medical opinion. That may show that Dr. Benson did something wrong years ago, when he formed a medical opinion after taking the history he deemed necessary at that time, and did not explore pesticide exposure. It does not show that the lawyer did anything wrong. Nor does the fact that another of the doctors defense counsel used told Caro that in his opinion, people sentenced to death ought to have the option of committing suicide, show that the lawyer did not function as Sixth Amendment "counsel."

That Caro experienced skull trauma and chemical exposure that may cause brain damage, does not prove any link between those factors and Caro's crimes. Aspirin sometimes causes Reyes' syndrome in children, but that does not mean that anyone who has taken aspirin as a child should be assumed to have suffered Reyes' syndrome. If the child did not fall ill with Reyes' syndrome, then it does not matter that he took aspirin. Absence of the consequence makes the potential cause immaterial. One thing may be a medical cause of another in the sense that it increases the probability of the consequence, but the consequence does not happen every time, and if it does not occur in a particular case, then the fact that the predisposing or causal factor was present does not prove anything that matters. Caro's experts did not find evidence of brain damage. So the fact that chemical exposure and skull trauma such as he had sometimes cause brain damage does not matter.

As it stands, I do not think the district courts and the bar can reconcile the majority decision with *Babbitt*. The majority has not articulated principles on which a distinction can be made. Without some meaningful principle to distinguish the cases, the decision whether a man lives or dies may ultimately not be controlled by neutral principles of law.

ability to maturely and meaningfully reflect on his actions was simply overwhelming." *Id.* at 1470. Likewise here.

## A. Deficient performance.

Today's decision does not take seriously the nature of our inquiry. The question is not whether we think Caro's lawyer could have done something more or better than he did. Nor is it whether, in almost two decades since Caro's death penalty was imposed, some lawyer or expert can think of something more that could have been said or done to try to persuade the jury not to impose the death penalty. The question is whether counsel's performance was so deficient that it was as if Caro had no lawyer at all. The answer, plainly, is "no."

The Supreme Court told us how to analyze petitions for habeas corpus asserting ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The majority does not follow the required analytic approach. *Strickland* held that the petitioner had not sufficiently made out a case of ineffective assistance or prejudice. In *Strickland* as here, counsel was accused of failing adequately to develop medical evidence to show mental problems.

*Strickland* holds that petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052. We are required to apply "highly deferential" judicial scrutiny, which requires that "every effort be made to eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. 2052. The majority does not identify errors of that level of seriousness, does not review counsel's conduct with any deference at all, and applies nothing but hindsight.

The alleged errors of counsel that the majority identifies are (1) failure to investigate Caro's personal background, (2) failure to consult a neurologist or toxicologist, and (3) failure to provide those experts consulted with sufficient information. The record does not establish that counsel fell below *Strickland* standards with respect to any of these.

As to the first issue, Caro's personal background, the majority opinion does not attempt to identify anything that a minimally competent lawyer would have done that Caro's lawyer did not do. The majority mentions Caro's personal background and a physician's claim that his testimony would have been different had the physician known of Caro's "social and cultural history." The majority cites *Siripongs v. Calderon,* 35 F.3d 1308, 1310–13 (9th Cir.1994), for the proposition that "failure to present evidence necessary to bridge a cultural gap may constitute ineffective assistance of counsel." But the majority does not relate these observations to the question of whether counsel in this case rendered ineffective assistance.

Caro's lawyer got both of Caro's parents to testify that they had sorely abused him. He also persuaded Caro's brother, a brother-in-law, a former girlfriend, an ex-wife, a friend from high school, Caro's high school football coach, Caro's boss at work, a vocational instructor from the prison Caro had served time in, a psychologist, and a licensed clinical social worker to testify. They told the jury all about Caro's background, culture, and suffering. They told the jury about how impoverished the family was, and about how Caro suffered from prejudice on account of his Mexican–American Yaqui heritage, and how Caro was called "Stinky" in school because he stunk of pesticides. What does the majority think a minimally competent lawyer would have done to investigate and "bridge a cultural gap" that Caro's lawyer did not do? I have no idea, because the majority opinion does not say. I also have no idea what Caro's proud heritage has to do with murder.

The meat of the majority opinion is that Caro's lawyer did not do enough to find the right experts and educate them about Caro's background. The opinion errs because it lacks a clear focus on the question: whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Suppose an evidentiary hearing were held, at which the most helpful possible propositions for Caro were proved: (1) that the only reason counsel did not do more was that

he did not think of it, and (2) that had counsel done more, he would have found a toxicologist who would testify that pesticide exposure such as Caro had suffered can cause brain damage. That does not add up to a colorable claim of performance below the *Strickland* standard.

Caro's lawyer consulted two psychiatrists, a clinical psychologist, and a licensed clinical social worker, in his diligent attempt to develop evidence of some sort of mitigating mental or emotional condition. The psychiatrists were of course medical doctors. One had, in addition to his M.D., two Ph.D. degrees, in physiology and pharmacology. It is the expert's duty, not the lawyer's, "to recognize what information he needs in order to render an opinion." *Coleman v. Calderon,* 150 F.3d 1105, at 1115 (9th Cir.1998).

The majority accepts Caro's new lawyers' claims that his lawyer at sentencing should have consulted a toxicologist or neurologist. Even if that would have been desirable, it does not establish "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. A lawyer defending a criminal case is entitled to rely on a physician to tell him whether another physician in a different specialty is needed. People commonly rely on their own physicians to guide them to the appropriate specialists, in matters of their own life and death. It is the doctor's fault, not the patient's, if the physician does not offer the appropriate guidance.

> [I]n the absence of a specific request, counsel does not have a duty to gather background information which an expert needs. Part of the skill of an expert is to recognize what information he needs in order to render an opinion. To require an attorney, without interdisciplinary guidance, to provide a psychiatric expert with all information necessary to reach a mental health diagnosis demands that an attorney already be possessed of the skill and knowledge of the expert.

*Coleman v. Calderon,* 150 F.3d 1105, at 1115 (9th Cir.1998) (internal citation and quotation omitted). That one of the psychiatrists now says that if he had learned more about Caro,

he would have testified differently, reflects badly on the psychiatrist, not on Caro's lawyer. If the doctor needed to know more to form a reliable opinion, he should have asked. The two physicians (one also an expert in pharmacology) did not tell Caro's lawyer to look for evidence of exposure to toxic chemicals or to consult a toxicologist. Evidently they did not think of it, and did not think of asking questions when taking medical histories that would lead them to think of it. So why should a minimally competent lawyer have thought of it?

What Caro's lawyer's experts told him gave him no reason to shop for more evidence on brain damage, mental defect, psychiatric problem, or any other such theory to mitigate punishment. The psychologist, Dr. Leifer, found that Caro was "functioning within the superior range of psychometric ability," with an I.Q. of 124. He found that Caro had "no gross or significantly manifested evidence of psychotic disorganized functioning." Caro went to college, where he performed satisfactorily until his girlfriend broke up with him in his senior year. Then he joined the Marines, where he did so well that he became a commissioned officer, a lieutenant; he was discharged after the rape and kidnapping. Despite a history that could have led to some sort of relevant brain damage, the two psychiatrists and the psychologist who studied Caro did not find any. If these experts could not think of anything else to ask about Caro's history, find brain damage, or think to suggest consulting a toxicologist or neurologist, *a fortiori* Caro's lawyer was not incompetent for failing to do so.

Caro's lawyer made the best of what his experts gave him, by having the psychologist testify that despite his intelligence and apparent normality, Caro had a mental defect which could be a result of child abuse. The defect would cause "sudden lapses where the quality of reality testing is gone under aggressive and demonic themes." Caro's lawyer built on this with massive evidence of child abuse.

A lawyer who sends his defendant to two psychiatrists and a psychologist to try to find some mitigating evidence regarding mental condition has done enough. That years later,

a new army of lawyers have found a professor at Yale Medical School who has thought of something more that could have been shown, a theory that exposure to pesticides might have damaged Caro's brain [2], is entirely irrelevant to the question: whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

## B. Prejudice.

The other half of *Strickland* is that the petitioner must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* Yet a "conceivable effect" is the most that Caro's new lawyers have even arguably suggested. The Court defined the test as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. In *Strickland*, and in *Williams v. Calderon*, 52 F.3d 1465 (9th Cir. 1995), despite some additional evidence that might have been used to show medical problems, it would have made no difference. Likewise in this case.

The Court instructed us in *Strickland* that we "must consider the totality of evidence before the judge or jury" in determining whether there was a reasonable probability of a different result, but for unprofessional errors. Yet the majority pointedly avoids considering the "totality" of evidence. A reader of the majority opinion cannot even find out what Caro did. But the jury knew. It is our duty to consider the "totality of evidence," not just the evidence generating

sympathy for Caro, to decide whether introduction of the new toxicology evidence probably would have changed the jury's collective mind.

At around seven on a summer evening, two teenaged cousins, Mary Booher and Mark Hatcher, went bicycle riding together. Their mother and grandmother went out to meet them a half hour later, and heard a shot. Soon after, they found Mark, shot in the face, dead. Their bicycles were found the next day in a ditch, but Mary had disappeared. She was found five days later in an orange grove, shot in the head, dead and decomposing. Caro had killed the boy, kidnapped the girl, and then killed her too.

After killing the boy and kidnapping the girl, Caro careened away from the scene in his pickup truck, with the bicycles in the bed, and clipped a car in the parking lot of a bar. When he did not stop, the car owner and his friend chased and caught him. Caro got out of his truck and said "don't hurt me," while hiding one hand. One of the men told him they were not going to hurt him, but wanted to know if he had insurance. Caro then exposed his hidden hand with a gun in it, shot that man in the face, and shot the other man in the thigh. Then he approached the first man, who was on the ground, and shot him again, in the chest. Then he chased the other man, who was fleeing despite his wound, and continued to shoot at him until he ran out of bullets. Miraculously, both men lived and testified. *People v. Caro*, 46 Cal.3d 1035, 251 Cal.Rptr. 757, 761 P.2d 680 (Cal.1988).

Caro hid his pickup truck. He shaved off his mustache. After getting caught, he repeatedly tried to escape. He gave a false alibi. He did not testify at his trial. Bullet

---

**2.** The majority responds to my dissent by attacking what it calls my "disdain for the Yale Medical School." I have no idea what my reference to Yale Medical School has to do with "disdain." The point is that a lawyer does not have a duty to gain access to and testimony from a professor at one of the most eminent institutions in the country, in order to be minimally competent. Though Caro's lawyer did not scale the walls of Yale, he did consult several other highly qualified experts. They did not refer him to someone more specialized or learned, or advise him that he needed to consult someone else.

Caro's new submissions do not even claim that in December 1981, when the jury returned a verdict of death, the medical literature established that exposure to the chemicals in pesticides may cause brain damage. For all we know from the record, the medical basis for the majority opinion developed in the medical literature during the years that have elapsed since the jury decided this case. If so, no lawyer, however diligent, could have proved then what is claimed now.

fragments from Mark's brain and the wall of a house where the man shot in the thigh had fled, matched Caro's girlfriend's gun, which he had access to at the time. The paint on the car clipped in the bar parking lot matched the paint on Caro's pickup truck. The man shot in the thigh recalled Caro's license plate number almost exactly. Extensive additional evidence made the case irrefutable. A state superior court jury convicted Caro of two counts of first degree murder with use of a firearm, one count of kidnapping with use of a firearm, and two counts of assault with intent to murder with aggravating factors.

The sentencing jury learned of two additional murders that Caro had apparently committed. Two teenaged girls were found dead in an orchard, shot in the head, with a bullet fragment from Caro's girlfriend's gun. The girlfriend could not have done it, because semen was found in the vagina of one of the girls. The jurors had been instructed that they could not consider these murders unless they unanimously found beyond a reasonable doubt that Caro had committed them, and four jurors were not so persuaded, so presumably the jury did not consider them.

A live victim of one of Caro's former crimes also testified, a superior court commissioner. When she was a law clerk six years before, she took a bus to work, but it stopped and discharged all the passengers some miles away. She tried to hitchhike into work, and Caro picked her up. Once he had her in the car, he pulled a gun and threatened to kill her if she did not do what he said. He kidnapped her, driving her far into the desert. She tried to get away during the four hours he held her by insisting she had to go to the bathroom at a gas station, but Caro came into the ladies' room and forced her out and forced her back into the car. Far from

town, he got her out of the car, made her strip naked, and raped her. Eventually she made a daring escape into traffic on a freeway. Caro was caught, pleaded guilty to kidnapping in exchange for dismissal of other charges, and served some time.

In *Strickland* and in *Williams,* with no more horrible facts, it was held that the additional evidence would probably have made no difference to the outcome. Likewise here, Caro could at most demonstrate a "conceivable effect," *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052, not a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. The jury knew that he had murdered a teenaged boy and girl who had no relationship to him at all. Then he tried to kill two men who got in his way. This was no aberrational lapse from a pattern of good behavior. Six years before, he had kidnapped a woman for an extended period and raped her. Caro's relentlessness was demonstrated when he pursued his kidnap and rape victim into the ladies' bathroom, and again when he pursued the two men whose car he had hit until he ran out of bullets.

In *Williams,* we said that the evidence "was so clear, lucid and powerful that no psychiatrist would have made a difference." *Williams,* 52 F.3d at 1470. Caro's lawyer put extensive mitigating expert and lay testimony before the sentencing jury. The jury heard 39 witnesses. In the case at bar, it is even more unpersuasive than in *Williams* to suggest that one more expert would have made a difference. The defense could have put on a toxicologist to say that Caro's exposure to pesticides killed some brain cells. The prosecutor could have put on a physician to say that every stroke victim has suffered death of brain cells yet still ordinarily knows right from wrong and does not shoot people.[3]

---

3. The majority claims that my ignorance of medicine disables me from understanding what the majority, without reference to any authority in the record or learned treatises, claims, that brain damage from stroke "does not cause aggressive behavior." Sometimes it does. "Only a few patients become serious *behavior problems* or are psychotic after a stroke, but paranoid trends, ill temper, stubbornness, and peevishness are recognized sequelae." Mohr, Fisher and Adams,

Cerebrovascular Diseases 1924, in Harrison's Principles of Internal Medicine (9th ed.1980) (emphasis in original).

Brain damage does not commonly cause murder, so is not necessarily an excuse for murder. Many people suffer destruction of brain cells, from stroke, trauma, toxins, and other causes. Few kill. Even in the unlikely event that a minimally competent lawyer should have found a

The jury would have been left with the brutal murder of two young people on bicycles, the relentless attempted murder of getaway witnesses, the kidnapping and rape six years before, and the demonstrated ability to perform at an extraordinarily high level on intelligence tests and in the Marines.

Because Caro has presented no evidence, either of errors by counsel so grave that it is as though he had no lawyer at all in the Sixth Amendment sense, or of prejudice from the errors he claims counsel made, we should follow our own precedent in *Williams* and affirm.

witness to testify that Caro's exposure to pesticides may have damaged his brain, this record still would not establish prejudice from the absence of such testimony. Proving that pesticides may cause brain damage does not prove that they did, and proving that they did does not prove that Caro should be partially excused for murdering the boy and girl riding their bicycles. A jury would not necessarily assume that anyone with brain damage would, as a result, be compelled by his disorder to kill. Considering all the mitigating evidence that did not persuade the jury to refrain from the death penalty, there is no particular reason to suppose that this additional evidence would have mattered.

It is also significant that, even after almost two decades of post-sentencing litigation, Caro's lat-est lawyers and doctors have not come up with definitive evidence that he is brain damaged now, or was at the time he killed the boy and girl riding their bicycles. His new experts suggest that he may have been brain damaged, based on what some chemicals in pesticides sometimes can do, clinical impressions, and Caro's own reports of his abnormal feelings and unfortunate history. This is a weak case for prejudice from ineffective assistance. Plenty of people who grew up on farms, constantly exposed to pesticides, feel fine, and do not kill anyone. That some of the individuals exposed to certain chemicals may suffer brain damage, which may contribute to disorders of feeling and thought, does not establish that all persons so exposed are free of responsibility for what they do.