James Granvil **WALLACE,**
Petitioner–Appellant,

v.

Terry **STEWART,** Respondent–Appellee.

No. 97–99016.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 22, 1998.

Decided July 21, 1999.

---

James Belanger, Coppersmith & Gordon, Phoenix, Arizona, for petitioner-appellant.

Colleen L. French, Assistant Attorney General, Phoenix, Arizona, for respondent-appellee.

Before: HUG, Chief Judge, and KOZINSKI and T.G. NELSON, Circuit Judges.

KOZINSKI, Circuit Judge:

Petitioner, James Granvil Wallace, pleaded guilty to first degree murder and was sentenced to death. The circumstances of the crime are brutal and undisputed. One afternoon in February 1984, Wallace lay in wait at the mobile home he shared with his girlfriend, Susan Insalaco, and her two children. The first person to arrive was Anna, Susan's 16–year–old daughter. Wallace struck her repeatedly with a baseball bat, breaking the bat. As Anna lay moaning, he forced the broken bat through her throat until it hit the floor, and then dragged her body into the bathroom. Gabe, Susan's 12–year–old son, arrived next. Wallace struck him repeatedly with a pipe wrench, fracturing his skull and leaving brain matter on the floor. Susan arrived last and he struck her repeatedly with the wrench. Wallace then took money from Susan's wallet, bought some liquor and drank it; he spent the night at a friend's house. The next day he turned himself in to the police. He has reported what he remembers of the murders and has never denied he was the perpetrator. Indeed, he insisted on pleading guilty in order to spare the victims' family the anguish of a trial.

Nothing in the record explains Wallace's violent actions. The senselessness of the tragedy is underscored by the fact that the rational mind can find nothing that Wallace gained by destroying Susan Insalaco and her children. The bizarre circumstances of the crime suggest that Wallace may have been acting as a result of some mental infirmity, which might have constituted a mitigating circumstance under Arizona's death penalty sentencing scheme. Nevertheless, Wallace was sentenced to death for his crimes, and his principal claim in his federal habeas petition is that his counsel were ineffective in presenting the available mitigating evidence to the

sentencing court. It is to this question we turn first.

## Ineffective Assistance of Counsel

A. Several lawyers represented Wallace in his state court proceedings. Lamar Couser, who was appointed after two previous counsel withdrew, represented Wallace through his guilty plea and initial sentencing. Couser moved for a mental examination, and Dr. Richard Hinton, a court-appointed clinical psychologist, found Wallace competent to stand trial based on a review of police records, the results of an MMPI (psychological profiling) test and a brief interview with Wallace. Wallace then pleaded guilty to the three murders. In the two and a half months between the plea and sentencing, the probation department had two psychiatrists, Drs. Barry Morenz and James Little, examine Wallace. Their joint evaluation, which was included in the presentence report, diagnosed Wallace with antisocial personality disorder and polysubstance abuse, and noted that Wallace's mother "appeared to have suffered from a mental illness of psychotic proportions."

Couser then retained Dr. Otto Bendheim, another psychiatrist, to testify on Wallace's behalf at the sentencing hearing. However, Couser did not provide Bendheim with Wallace's MMPI results or with any information about Wallace's background. From his brief interview with Wallace and the presentence report, Bendheim ascertained that Wallace's mother had been mentally ill. Bendheim was unable to diagnose Wallace with any type of mental infirmity and testified that Wallace

had been aware of his actions. His only explanation for Wallace's conduct was that "there must've been something that went wrong in [his] mind."

Couser argued briefly for leniency. He mentioned Wallace's "chaotic upbringing" in passing, but focused on Wallace's history of heavy drug use and the possibility that he had dissociated during the murders. The court found one aggravating factor applicable to all the murders: that they were committed under especially heinous, cruel or depraved circumstances. As to Susan Insalaco, the court also found that her murder was committed for pecuniary gain (theft of the liquor money), another aggravating circumstance. With barely a mention of Wallace's mental health, the court found one mitigating circumstance, Wallace's remorse. However, it found this didn't outweigh the aggravating circumstances, and sentenced Wallace to death on all three murder counts.

George Curtis took over as counsel on appeal. He persuaded the Arizona Supreme Court to reverse the pecuniary gain aggravating circumstance and to modify the trial court's findings on the "cruel, heinous or depraved" aggravating circumstance. The court remanded for resentencing with respect to the mother's murder, but affirmed with respect to the murders of the children. *See State v. Wallace,* 151 Ariz. 362, 728 P.2d 232 (1986).[1] Thus, the stakes at Wallace's resentencing were relatively low: Because two of Wallace's death sentences remained in place regardless of the remand, Curtis could not spare his client the death penal-

---

1. Wallace argues that the Arizona Supreme Court should also have remanded or reweighed his sentence for the children's murders before affirming. However, the court did not invalidate the aggravating factor attached to the children's murders, a prerequisite for remanding or reweighing. *See Clemons v. Mississippi,* 494 U.S. 738, 741, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Here, though the Arizona Supreme Court found that the murders were not cruel, it did find them heinous and depraved. *Cf. State v. Miles,* 186 Ariz. 10, 918 P.2d 1028, 1037 (1996) (cruelty

without heinousness can be an aggravating factor, as can heinousness without cruelty). Although Arizona passed a law in 1994 requiring the state supreme court to reweigh the aggravating and mitigating circumstances in all death cases where it determines that an error was made with respect to a finding of aggravation or mitigation, *see* Ariz.Rev.Stat. § 13–703.01(B) (1994), this procedure was certainly not required—under state or federal law—when Wallace's case was before the Arizona Supreme Court in 1986.

ty, no matter how persuasive a showing he made as to the murder of the mother.[2]

At resentencing, Curtis presented the testimony of a new psychiatrist, Dr. David Gurland. Curtis provided Gurland with police reports and Dr. Bendheim's testimony but gave him no information about Wallace's background or family history. Gurland later claimed that he spoke with Wallace's brother while preparing his diagnosis, but Wallace does not have a brother. Gurland testified that Wallace was in a dissociative state at the time of the murders, and hypothesized that Wallace's psychological problems were rooted in part in his mother's early death, but Wallace's mother is still alive.[3] Beyond this flawed account, no witness discussed Wallace's background in significant detail at the hearing. Gurland concluded that Wallace was not able to fully appreciate the wrongfulness of his actions or to con-

form his conduct to the requirements of law-a mitigating circumstance under Ariz. Rev.Stat. § 13–703(G)(1). Drs. Hinton and Morenz concluded otherwise, testifying for the government that Wallace had not been dissociated at the time of the murders. The court again sentenced Wallace to death, and this time the Arizona Supreme Court affirmed. *See State v. Wallace,* 160 Ariz. 424, 773 P.2d 983 (1989).

■ B. Because Wallace admitted committing the murders and pleaded guilty, the only question left for trial was Wallace's sentencing. Exploring the defendant's mental state and other potential mitigating factors was clearly a central task for his counsel. Yet Wallace's lawyers devoted remarkably little time to this task.[4] Of the 45.9 hours Couser spent on Wallace's case, he spent 36 minutes conferring with Dr. Bendheim, and only 1.4

---

2. As a practical matter, it was also highly unlikely the sentencing judge would have changed his mind about imposing the death penalty for Susan's murder. Having imposed the death penalty as to the children on the ground that the murders were heinous and depraved, it is doubtful he would have found the murder of the mother was not equally heinous and depraved.

3. Upon hearing this testimony, Wallace exclaimed, "My mother's alive. I don't know who the hell you're talking about. You sure as hell aren't talking about me." Gurland thought this reaction confirmed his original diagnosis, and testified that this outburst demonstrated that Wallace was unable to control his anger.

4. Citing *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), the district court held that it couldn't consider certain affidavits and documents Wallace presented—including affidavits from the doctors who examined Wallace prior to and after his sentencing hearing, and affidavits by Wallace's sisters—because they had not been offered in state court. However, *Keeney* does not bar Wallace from presenting, or us from considering, this additional evidence. *Keeney* held that a habeas petitioner is not entitled to a federal evidentiary hearing unless he shows cause and prejudice for failing to adequately develop the factual record at an earlier state evidentiary hearing. *See id.* at 11, 112 S.Ct.

1715. In his first state post-conviction proceeding, which Curtis filed hurriedly to obtain a stay of execution, Wallace made no claim regarding ineffective assistance of counsel at the plea and sentencing phases. Therefore, we will not penalize him for failing to develop the record on that question.

In a second state post-conviction proceeding, Wallace did make the same ineffective assistance claim that he raises here. Although the State argued that Wallace had defaulted the ineffective assistance claim by not raising it in his first petition, the state court rejected the claim on the merits. This denial by the state court satisfies the *Keeney* cause and prejudice standard. Wallace, an indigent, had moved for the appointment of an investigator, an evidentiary hearing and funds for mental health experts. The state court, despite having before it the compelling affidavits of Drs. Bendheim and Gurland, denied the motions. Under *Correll v. Stewart,* 137 F.3d 1404 (9th Cir.1998), Wallace fulfilled the cause prong of *Keeney* because he properly presented a colorable claim, and the state court denied him an evidentiary hearing. *See id.* at 1413. Wallace also satisfied the prejudice prong because there is a reasonable probability that the state courts would have granted him relief, had he been allowed to develop the evidence. We may therefore consider the affidavits in support of Wallace's ineffective assistance claim, and the district court may consider them on remand.

additional hours talking to other prospective witnesses for the sentencing hearing. He did not provide Bendheim with the MMPI results and he did not investigate what Drs. Little and Morenz referred to as Wallace's "very chaotic childhood." This information was easily within his reach: Wallace's three sisters have since signed affidavits saying they would have willingly provided information about Wallace's childhood and testified on his behalf, yet Couser never contacted them.

Curtis spent 45.25 hours preparing for Wallace's resentencing, including only about an hour interviewing witnesses. In his own words, he "conducted no factual investigation concerning . . . potential mitigation [ ] or the appropriateness of the death penalty." Curtis Aff. ¶ 4.

Had they only looked, Couser and Curtis would have discovered a great deal about Wallace's family history, which Dr. Bendheim now describes as "one of the most dysfunctional family environments I have ever encountered." Wallace's mother was in and out of mental hospitals, diagnosed as psychotic, alcoholic and anorexic, among other things. On one occasion, she stabbed her husband in the head with a butcher knife. On multiple occasions, she tried to kill herself. She would disappear for weeks, and her children eventually would find her hidden naked somewhere in the house. On one particularly bizarre occasion, she resurfaced underneath Wallace's bed, naked and kicking so hard the bed bounced up and down. Wallace woke up the household with his screams. Wallace's father, a severe alcoholic, once "cold-cocked" his wife in front of Wallace and "stomped" repeatedly on her neck. Wallace himself sniffed glue and gasoline daily between the ages of ten and twelve, and experienced a "clinically significant series of head traumas" while growing up. Dr. David Lisak, who examined Wallace in 1993, concluded that "[t]he family and home in which Jim Wallace was raised was marred by an almost unimaginable level of chaos, neglect, bizarre and insane behavior, and by extreme violence between the parents."

The sentencing judge saw only glimmers of this history, and received no evidence about its significance vis-a-vis mitigating circumstances. Wallace has presented affidavits from three psychiatrists explaining that psychosis and alcoholism are genetically passed from parents to children, and both of Wallace's parents displayed signs of major mental health disorders. Furthermore, children raised in profoundly dysfunctional environments like the Wallace household are prone to develop severe psychiatric disturbances. Indeed, the evidence now shows that Wallace suffers from a "major depressive disorder" and, most probably, organic brain damage.

■ The doctors who testified both for and against Wallace now agree that their diagnoses were at least incomplete. Dr. Bendheim believes the information about Wallace's family background "would . . . have been of vital importance" to his diagnosis, and the "extreme[ly] importan[t]" MMPI results could have had a "substantial[ ] impact[ ]." Dr. Gurland based his testimony primarily on Bendheim's original, admittedly incomplete, analysis. Even the government's experts agree. Dr. Hinton characterizes Wallace's background as "extremely important" information, and now says he "would have, at the very least, recommended that a full competency examination of Mr. Wallace be conducted." Dr. Morenz now believes that Wallace suffers from multiple mental disorders, and that at the time of the murders, "Wallace's capacity to conform his conduct to the requirements of the law was significantly impaired." In sum, had these experts known the details of Wallace's family background, the substance and tone of the sentencing hearings would have been significantly different. Which brings us to the heart of the issue here: Does an attorney have a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request? The answer, at least at the sentencing phase of a capital case, is yes.

The facts here are similar to those in a recent case where we remanded for an evidentiary hearing on the question of ineffective assistance of counsel at the penalty phase. In *Caro v. Calderon,* 165 F.3d 1223 (9th Cir.1999), we stated that "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Id.* at 1227. There, defense counsel knew that the defendant had been abused as a child and exposed to neurotoxic chemicals throughout his life. However, the lawyer did not seek out neurochemical experts or even provide the examining doctors with the information he had about the defendant's background. Upon learning the full extent of Caro's background, one examining doctor declared that had he known it earlier, he would have testified that the defendant had diminished mental capacity. *See id.* at 1226. Although the lawyer's failure to develop and relay medical evidence did not constitute ineffective assistance at the guilt phase, we concluded that sentencing-where mitigation evidence may well be the key to avoiding the death penalty-is different. *See id.* at 1227. We explained that,

> [c]ounsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert.... A lawyer who knows of but does not inform his expert witnesses about ... essential pieces of information going to the heart of the case for mitigation does not function as "counsel" under the Sixth Amendment.

*Id.* at 1226, 1228.

Wallace's situation also bears some similarity to two recent cases where we af-

firmed findings of ineffective counsel at the penalty phase. At the sentencing hearing in *Clabourne v. Lewis,* 64 F.3d 1373 (9th Cir.1995), Clabourne's lawyer relied on the trial testimony of one psychologist, and inadequately cross-examined the State's psychologists. *See id.* at 1384. However, he had barely prepared his own psychologist for his trial testimony, and had provided him with scant information about the defendant and his background. *See id.* Nor had the lawyer provided the State's psychologists with statements and records that would have helped them profile the defendant's mental health accurately. *See id.* at 1385. Clabourne's lawyer was also Lamar Couser. *See id.* at 1376.

In *Hendricks v. Calderon,* 70 F.3d 1032 (9th Cir.1995), we concluded that the defense lawyer had reasonably relied on psychologists' findings in not pursuing a mental defense at trial. *See id.* at 1037–39. Even though the psychologists lacked important information about Hendricks's drug problems and hard childhood, we held that counsel's failure to investigate and relay this information was not deficient because the psychologists had not asked for it. *See id.* at 1038. At the penalty phase, however, this same lack of diligence did constitute ineffective assistance.[5] Recognizing that "[e]vidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense ... in the guilt phase," we said that "where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Id.* at 1043.

---

5. *Hendricks* alludes to why the lawyer's burden might differ at the guilt phase from that at the penalty phase: Mental state is relevant at the guilt phase for issues such as competence to stand trial and legal insanity—technical questions where a defendant must show a specific and very substantial level of mental impairment. Most defendants won't have

problems this severe, and counsel can't be expected to know that further investigation is necessary to develop these issues. By contrast, all potentially mitigating evidence is relevant at the sentencing phase of a death case, so a troubled childhood and mental problems may help even if they don't rise to a specific, technically-defined level.

■ To descend to the level of ineffective assistance of counsel, a lawyer's performance must be poor indeed. Yet, *Caro, Hendricks* and *Clabourne* establish that, at the penalty phase of a capital case, a failure to investigate or to adequately prepare expert witnesses may sink to that level. Based on the affidavits he presented, Wallace has made out a prima facie case that Couser and possibly Curtis were less than competent at sentencing.[6] It's true that the experts who examined Wallace didn't ask Couser or Curtis to investigate his background further.[7] However, *Hendricks* holds that this does not relieve the attorneys of their duty to seek out such evidence and bring it to the attention of the experts.

Because there was no hearing, the State did not have an opportunity to cross-examine Wallace's affiants, or to present evidence of its own. Nor, of course, did the district court make any findings. However, were the district court to accept all of Wallace's evidence, it could find that Wallace's lawyers were ineffective, and conclude that "there is a reasonable probability that the death sentence would not have been imposed" had they been effective. *Hendricks*, 70 F.3d at 1044. We therefore remand for an evidentiary hearing and findings as to whether Couser and Curtis were ineffective and, if so, whether Wallace was prejudiced as a consequence.

■ C. Wallace also argues counsel were ineffective at the guilt phase, a much tougher sell given *Caro* and *Hendricks*. Wallace hasn't presented or even suggested enough evidence to show that he lacked the mental capacity to stand trial, or that he could have raised a credible insanity defense. Although Dr. Hinton now says he would have recommended a full competency hearing had he known more about Wallace's background, he didn't request more information at the time of the examination. Under *Hendricks*, Couser's failure to produce the information doesn't constitute ineffective assistance.

### Other Claims

■ Wallace argues the trial court erred by not ordering a pre-trial competency hearing. The court was entitled to rely on Dr. Hinton's original recommendation that Wallace was fit to stand trial. Further, the evidence before the trial court here resembles the evidence before the court in *de Kaplany v. Enomoto*, 540 F.2d 975 (9th Cir.1976) (en banc), where we held it was not error to fail to hold a competency hearing.

Wallace raises a number of other claims related to his sentence. Most are specious, but several do pose somewhat difficult questions. Should the ultimate result on the ineffective assistance claim be that the State must hold a new sentencing proceeding, it would be unnecessary to decide any of these other claims. We therefore do not reach them at this point. Should Wallace ultimately fail as to his ineffective assistance claim, we shall reinstate these claims and decide them then.

We REVERSE the district court's judgment as to ineffective assistance of counsel at the sentencing phase and REMAND for an evidentiary hearing on that claim. We AFFIRM on the remaining portion of the ineffective assistance claim and on the competency hearing claim.

---

6. But see pp. 8230 & n. 2 supra (noting that Curtis had little incentive to be forceful in his presentation).

7. The failure of a psychologist retained on Wallace's behalf to make a proper inquiry as to Wallace's background may also constitute a failure to provide competent psychiatric advice in violation of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Despite exhausting this claim in state court, Wallace has not raised it here.