**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MILO MCCORMICK STANLEY,
*Petitioner-Appellant,*

v.

DORA B. SCHRIRO,
*Respondent-Appellee.*

No. 06-99009

D.C. No.
CV-98-00430-PHX-
MHM

OPINION

Appeal from the United States District Court
for the District of Arizona
Mary H. Murguia, District Judge, Presiding

Argued and Submitted
September 9, 2008—Pasadena, California

Filed March 11, 2010

Before: Betty B. Fletcher, Andrew J. Kleinfeld, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Rawlinson;
Concurrence by Judge B. Fletcher;
Partial Concurrence and Partial Dissent by Judge Kleinfeld

## COUNSEL

Gilbert H. Levy (briefed), Seattle, Washington, and Paula K. Harms (briefed and argued) and Sylvia Lett (briefed), Assistant Federal Public Defenders, Phoenix, Arizona, for the petitioner-appellant.

Kent Cattani (briefed and argued), Chief Counsel, and J.D. Nielsen (briefed), Assistant Attorney General, Phoenix, Arizona, for the respondent-appellee.

# OPINION

RAWLINSON, Circuit Judge:

Petitioner Milo Stanley (Stanley) was convicted by a jury of first-degree murder of his wife and five-year-old daughter. The court sentenced Stanley to life in prison for the murder of his wife and to death for the murder of his daughter. Stanley's conviction and sentence were affirmed by the Arizona Supreme Court on direct appeal and his state petitions for post-conviction relief were denied. He subsequently filed a petition for writ of habeas corpus in the district court and now appeals the district court's denial of that petition.

Stanley asserts three grounds for relief. First, Stanley contends that his *Miranda*[1] rights were violated when officers ignored his attempted invocation of those rights and continued interrogating him until they secured a confession. Second, Stanley posits that trial counsel rendered ineffective assistance during the guilt phase of trial by failing to present readily available evidence to support an insanity defense and a lack of premeditation defense. Third, Stanley argues that trial counsel rendered ineffective assistance during the penalty phase of trial by failing to investigate and present readily available mitigating evidence. It is the last ground that gives us pause, as we take note of Justice O'Connor's remarks in 2001 that prompted the New York Times to editorialize that the "legal representation afforded most indigent defendants in capital cases" is woefully inadequate. *See* Editorial, *Justice O'Connor on Executions*, N.Y. Times, July 5, 2001, at A16.

Because we are convinced that defense counsel's performance did not prejudice Stanley during the guilt phase of the trial, we AFFIRM the district court's denial of Stanley's habeas petition as to the first two grounds. However, because Stanley's allegations raise serious questions and a colorable

---

[1]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

claim regarding the adequacy of counsel during the penalty phase of the trial, we REVERSE and REMAND that portion of the decision to allow the district court to conduct an evidentiary hearing. We simply cannot in good conscience continue to send men to their deaths without ensuring that their cases were not prejudiced by inadequate legal representation at any phase of the proceedings.

## I.

## BACKGROUND

### A.   Stanley's Interrogation and Confession

Stanley contacted the police on the evening of June 19, 1986, to report his wife and five-year-old daughter missing. *See State v. Stanley*, 809 P.2d 944, 946 (Ariz. 1991). The next afternoon, with the consent of both Stanley and his father, officers searched the pair's auto repair shop, where Stanley's wife's sisters had reported discovering bloodstains and a spent shell casing in the wife's car. *See id.* at 946-47. While officers searched the shop, Stanley was asked and agreed to accompany Officer Saravo (an investigator) to his office at the county building to be interviewed regarding the disappearance of his wife and daughter. *See id.* at 947. Stanley was specifically informed that he was not under arrest and was not a suspect.

Saravo initially approached the interview as a follow-up to a missing persons report, asking questions to reconstruct the family's activities on the night of the disappearance. He also asked questions to determine where they might have gone. However, there were indications early in the hour-long interview that Saravo suspected Stanley's involvement.

Approximately fifteen minutes into the interview, Saravo began to ask Stanley questions related to the officers' discovery of blood in his wife's car. Approximately twenty minutes

into the interview, Saravo turned to questions directed toward Stanley's use of his gun in connection with the car. Approximately twenty-five minutes into the interview, Saravo increased the pressure, but still did not reveal his suspicions. ("Can you tell me any reason why there would be blood on the outside of your vehicle?"); ("Can you tell me any reason why there would be blood on the inside of your vehicle?"); ("I want to tell you right now that there is blood on the vehicle.").

About thirty minutes into the interview, after advising Stanley of his *Miranda* rights, Saravo sought permission to search Stanley's apartment, to which Stanley consented. Before reading the *Miranda* warnings, Saravo assured Stanley, "You weren't under arrest and you're not under arrest at this time . . ." He explained that the rights were being read "just because we're going to ask you for a consent to search at this point." After reading Stanley his rights, Saravo again stated, "you're not under arrest at this time . . ."

Stanley granted consent to the search approximately thirty-six minutes into the interview and was allowed to leave to get a drink. When Stanley returned, Saravo began to point out the holes he saw in the story Stanley had related. Finally, approximately forty-five minutes into the interview, Saravo confronted Stanley with his suspicion: "Do you really think somebody actually surprised you (sic) wife at the shop, took your gun and put her in that car and took her out and killed her and brought the car back?" After Stanley answered in the affirmative, Saravo replied, "I don't think that could have happened," and then continued, "I think if that happened, if that in fact is what happened, that person almost had to have been you." When Saravo then asked Stanley who the perpetrator would have "had to have been," Stanley answered, "[m]e." At that point Stanley said, "I think I better talk to a lawyer. I don't want to say any more." After confirming that Stanley did not wish to answer questions, Saravo indicated that he was concluding the interview and stopped the recording. He did not tell Stanley that he was free to leave.

After an unknown period of time elapsed, Saravo turned the tape recorder back on. He purported to recognize Stanley's invocation of his rights ("You have requested to talk to an attorney, you don't have to talk to me."), then confronted Stanley with additional evidence and resumed questioning. ("It appears now that very strongly that your wife has met some foul play, understand?"); ("There's nothing more that you would like to do to locate your wife and child?"). At least ten minutes passed with Stanley sobbing and Saravo coming and going from the room before the tape ran out. Subsequently, Stanley apparently confessed to the killing.

Our colleague in dissent assiduously catalogs every heinous detail of this gruesome crime. *See Dissenting Opinion*, p. 4177-79. There is no doubt that the facts of this case are repulsive. But that is true for every case where the death penalty is imposed. If the resolution of this case rested on the relative heinousness of the offense, we would have no quarrel with our colleague in dissent. However, our charge is to look at the merits of the legal issues raised rather than to focus on the degree to which we are repulsed by the inevitably grisly details of the case. Indeed, our precedent leaves no doubt that the heinous nature of the underlying offense should not be the determining factor. *See Stankewitz v. Woodford*, 365 F.3d 706, 723 (9th Cir. 2004) (holding that "counsel's failure to present mitigating evidence can be prejudicial even when the defendant's actions are egregious"); *see also Douglas v. Woodford*, 316 F.3d 1079, 1091 (9th Cir. 2003) ("The gruesome nature of the killing did not necessarily mean the death penalty was unavoidable." (citations omitted).

## B.   *Admission of the Confession*

In denying Stanley's contention that his confession was wrongfully admitted into evidence, "[t]he trial court determined there was neither a *Miranda* nor an *Edwards* [*v. Arizona*, 451 U.S. 477 (1981)] violation because Stanley was not in custody at the time of Saravo's questioning." *Stanley*, 809

P.2d at 948. On direct appeal, the Arizona Supreme Court agreed, stating that, "[w]hether one is in custody is determined objectively: Under the circumstances, would a reasonable person feel deprived of his freedom of action? Factors indicative of custody include: (1) whether the objective indicia of arrest are present; (2) the site of the interrogation; (3) the length and form of the investigation; and, (4) whether the investigation had focused on the accused." *Id.* (citations omitted). Applying these factors, the court concluded that Stanley was not in custody and, therefore, *Miranda* warnings were not required. *See id.* On that basis, the court rejected Stanley's argument that, under *Edwards*, questioning should have ceased when he attempted to invoke his *Miranda* rights. *See id.* at 948-49.

## C. Dissociative Reaction and Insanity

Following his confession, Stanley was arrested. The next day he was seen by Dr. Hammitt, the jail psychiatrist. Among other things, Stanley told Dr. Hammitt that at the time of the killing "he experienced the sensation that he was watching like he wasn't even there." "He told [Dr. Hammitt] that he flew off the wall and shot them."

The dissent represents that Dr. Hammitt "concluded that Stanley was . . . not even remorseful." *Dissenting Opinion*, p. 4179. This characterization considerably overstates Dr. Hammitt's report. As the dissent notes, Stanley "cried a great deal" during the meeting with Dr. Hammitt, which observation is somewhat inconsistent with a complete lack of remorse. In fact, Dr. Hammitt described Stanley as "quite emotionally distraught," and "anguished, sobbing [and] unable to relate appropriately." In addition, Dr. Hammitt did not report that Stanley lacked remorse. Her precise statements were that "[n]othing [Stanley] said indicated to me any degree of remorse per se" and that Stanley "never volunteered any comments about remorse . . ." That is a far cry from a definitive statement that Stanley lacked remorse.

Prior to trial, defense counsel sought to exclude the notes regarding Dr. Hammitt's interview of Stanley (the Hammitt interview) on the basis of doctor-patient privilege. The court granted the motion. Defense counsel did not provide information regarding the Hammitt interview to the defense mental health experts who evaluated Stanley.

Upon learning of this information after trial, the defense experts declared that the information would have changed their opinions regarding Stanley's mental state at the time of the killings. Had they been provided with the Hammitt interview, both experts would have testified that Stanley most likely suffered from a dissociative reaction at the time of the killings, making it unlikely that he acted with premeditation.

## II.

### *STANDARDS OF REVIEW*

"We review de novo the district court's denial of a petition for a writ of habeas corpus." *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005), *as amended* (citation omitted). The district court's factual findings are reviewed for clear error. *See id.* We review the district court's determination that a petitioner is not entitled to an evidentiary hearing for abuse of discretion. *See Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007).

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), . . . a federal court can grant an application for a writ of habeas corpus on behalf of a person held pursuant to a state-court judgment if the state-court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

*Yarborough v. Alvarado*, 541 U.S. 652, 655 (2004) (citation and internal quotation marks omitted). "[C]learly established law as determined by [the Supreme Court] refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions . . ." *Id.* at 660-61 (citation and internal quotation marks omitted). "[Courts] look for the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* at 661 (citation and internal quotation marks omitted).

> The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case. The focus of [this] inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and [the Supreme Court] has stressed . . . that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (citations omitted).

## III.

## *DISCUSSION*

### A.   *Admission of Stanley's Confession*

To be entitled to relief based on an alleged violation of his *Miranda* rights, Stanley must show that the state court's determination that he was not in custody when he attempted to invoke his right to silence and right to have an attorney present during questioning either was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Stanley has failed to make this showing and, therefore, is not entitled to relief on this claim.

**[1]** Under clearly established federal law, *Miranda* warnings are required "only where there has been such a restriction on a person's freedom as to render him 'in custody.' " *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations omitted).[2] The "ultimate inquiry" underlying the question of custody "is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (citation and alteration omitted). To answer this question, the reviewing court looks to the totality of the circumstances, *id.* at 322, that might "affect[ ] how a reasonable person in that position would perceive his or her freedom to leave." *Id.* at 325.

**[2]** On direct review, the Arizona Supreme Court identified eight facts which, together, rendered Stanley's interview noncustodial.[3] First, the investigation that led officers to question Stanley was initiated by Stanley's report that his wife and daughter were missing. *See Stanley*, 809 P.2d at 948. Second, the interview took place at the county building rather than the police station. *See id.* Third, Stanley voluntarily agreed to the interview. *See id.* Fourth, he was told that he was not under arrest and was not a suspect. *See id.* Fifth, he was not disarmed of his hunting knife. *See id.* Sixth, the investigation was focused "on a search for missing persons . . ., not on a homicide." *Id.* Seventh, during the interview Stanley left the office, unaccompanied, to get something to drink and use the restroom. *See id.* Eighth, there was no display of weapons by police, and no use of physical force or threatening language. *See id.*

Stanley contends that the state court failed to address the

---

[2]Although *Stansbury* was decided after the Arizona Supreme Court's 1991 decision in *State v. Stanley*, the principles it discusses were clearly established federal law based on Supreme Court decisions announced prior to 1991. *See Stansbury*, 511 U.S. at 322-25.

[3]On habeas review we examine the last reasoned decision from the state courts. *See Mejia v. Garcia*, 534 F.3d 1036, 1042 (9th Cir. 2008).

increasingly accusatory nature of the questioning to which he was subjected. This argument lacks merit. An officer's expressed suspicions may be relevant to the issue of custody. *See Stansbury*, 511 U.S. at 325. However,

> [e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. . . . In sum, an officer's . . . beliefs concerning the potential culpability of the individual being questioned, may be *one among many factors* that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

*Id.* (emphasis added).

**[3]** Although it is somewhat troubling that the court failed to explicitly address the accusatory nature of Saravo's questioning, the omission does not render the court's application of federal law unreasonable. In the context of determining whether a state court has reasonably applied clearly established federal law to reach its determination, "the range of reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough*, 541 U.S. at 664. "The custody test is general," *id.* at 665, and "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* at 664 (citation omitted); *see also Oregon v. Mathiason*, 429 U.S. 492, 494-95 (1977) (per curiam) (holding that a suspect was not in custody despite being informed that he was a suspect and confronted with fabricated evidence linking him to the crime). Because the state court delineated and weighed factors comparable to those the Supreme Court has considered, *cf. Yarborough*, 541 U.S. at

664, we conclude that the Arizona Supreme Court reasonably applied federal law in determining that Stanley was not in custody when he confessed.

## B.  *Ineffective Assistance of Counsel: Guilt Phase*

**[4]** To establish a violation of his Sixth Amendment right to effective assistance of counsel, Stanley must show that (1) counsel's performance fell below an "objective standard of reasonableness" and (2) he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). If we conclude that the petitioner fails to satisfy one of the *Strickland* prongs, we need not address the other. *See id.* at 697. Because Stanley failed to demonstrate that he was prejudiced by trial counsel's alleged shortcomings, he is not entitled to relief.

**[5]** To establish prejudice, Stanley "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (emphasis added). Where, as here, there is a contention that trial counsel's performance was deficient due to failure to present evidence to support a defense, there must be a reasonable probability that the omitted evidence would have raised a reasonable doubt in jurors' minds as to guilt. *See id.* at 695.

**[6]** Stanley contends that he was prejudiced by counsel's failure to present evidence revealed in the Hammitt interview to his experts. According to Stanley, the experts could then explain the significance of that interview to the jury to establish an insanity or diminished capacity defense. However, Arizona law bars the admission of expert testimony regarding the mental state of the defendant at the time of the offense. *See State v. Mott*, 931 P.2d 1046, 1050 (Ariz. 1997). As a result, Arizona courts have "consistently refused to allow psychiatric testimony to negate specific intent." *Id.* at 1051 (cita-

tions omitted). "Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime." *Id.*; *see also Clark v. Arizona*, 548 U.S. 735, 756, 779 (2006) (holding that exclusion of expert testimony regarding diminished capacity does not violate due process). This is a longstanding rule in Arizona. *See Mott*, 931 P.2d at 1050.

**[7]** Much of the proffered testimony upon which Stanley relies falls within the scope of Arizona's bar. For example, Dr. Bindelglas, one of the expert witnesses, stated in an affidavit:

> Without regard to whether Stanley was insane under the requirements of Arizona law at the time the shooting of his wife and daughter occurred, there was a very real issue as to whether Stanley could premeditate his actions if they occurred during a Dissociative Reaction . . . . Had I been asked, I would have testified that a Dissociative Reaction is a spontaneous, involuntary event and so there were very substantial doubts that Stanley premeditated his actions, regardless of whether he met the legal test for insanity in Arizona.

Dr. Bindelglas declared that access to the Hammitt interview would have provided corroboration for his conclusion that Stanley had suffered a dissociative reaction. Similarly, another expert witness, Dr. Garcia-Bunuel, stated in an affidavit that the Hammitt interview generated an "opinion that at the time of the killing of his wife and daughter, it is highly probable that Mr. Stanley was suffering from a Dissociative Reaction."

**[8]** Expert testimony that Stanley suffered a dissociative reaction at the time of the killing would not have been admissible to challenge premeditation. *See Mott*, 931 P.2d at 1051 ("Arizona does not allow evidence of a defendant's mental

disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime."). No prejudice is suffered when counsel declines to pursue the development of testimony that would be inadmissible at trial. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999).

Stanley attempts to re-frame the issue to avoid Arizona law limiting the admissibility of expert testimony on the issue of premeditation by describing the testimony as addressing "character traits." An expert witness may testify as to "a person's continuing general personality trait" (e.g., general tendency to act without reflection), but may not testify as to "a person's probable state of mind at the time of the offense." *State v. Ortiz*, 764 P.2d 13, 18 (Ariz. 1988) (citation omitted). Stanley's reliance on this proposition is misplaced because the testimony of Drs. Bindelglas and Garcia-Bunuel would not be that Stanley had a "character trait of impulsivity," as argued by Stanley. Rather, Dr. Bindelglas would have testified that "a Dissociative Reaction is a spontaneous, involuntary event and so there were very substantial doubts that Stanley premeditated his actions, regardless of whether he met the legal test for insanity in Arizona." This testimony directly conflicts with Arizona's limitation on expert testimony. *See id.* at 18 ("An expert witness may not testify specifically as to whether a defendant was or was not acting reflectively at the time of a killing.") (citation, alteration and emphasis omitted). Likewise, Dr. Garcia-Bunuel's testimony would have focused impermissibly on the likelihood of a dissociative reaction "at the time of the killing of his wife and daughter."

In his subsequent declaration, in addition to opining that Stanley likely suffered a dissociative reaction, Dr. Garcia-Bunuel stated his "further opinion that as a result of [his Dissociative Reaction], it is highly probable that Stanley met the criteria for the M'Naughten standard of insanity." Testimony to this effect would not have been barred, as Arizona allows expert testimony that a defendant meets the legal definition of insanity. *See Mott*, 931 P.2d at 1051. However, we conclude

that the absence of testimony to this effect did not prejudice Stanley due to the overwhelming evidence that he was sane. Indeed, two of the other experts who testified at trial expressly disagreed with Dr. Garcia-Bunuel on this point.

[9] Finally, despite the fact that trial counsel successfully petitioned the court to exclude Dr. Hammitt's interview from admission into evidence, Stanley argues now that Dr. Hammitt's interview should have been offered into evidence. Although observation evidence offered by an expert is admissible to rebut the prosecution's evidence of *mens rea*, *see Clark*, 548 U.S. at 760, 765 n.34,[4] we conclude that Stanley was not prejudiced by trial counsel's failure to introduce the Hammitt interview into evidence. It is true that Dr. Hammitt made statements that could support a lack-of-premeditation defense. For example, she described Stanley as "quite emotionally distraught," "anguished, sobbing, [and] unable to relate appropriately." However, it is unlikely that Dr. Hammitt's observation evidence would have overcome the substantial evidence of premeditation presented at trial.[5]

[10] The district court specifically referenced the particulars of the shootings ("evidence of similarly-placed contact

---

[4]It would have been appropriate for Dr. Hammitt to offer observation evidence because she interviewed Stanley shortly after the murders were committed. *See State v. Wright*, 155 P.3d 1064, 1068 (Ariz. Ct. App. 2007) (noting that "[o]bservation evidence includes evidence of a defendant's behavior, statements, and expressions of belief *around the time of the offense*.") (citation omitted) (emphasis added).

[5]Premeditation requires a showing of actual reflection prior to the killing; the decision to kill must "be more than just a snap decision made in the heat of passion." *State v. Thompson*, 65 P.3d 420, 427 (Ariz. 2003). Premeditation may be proved through either direct or circumstantial evidence. *See id.* at 428. However, it is usually proved by circumstantial evidence. *See id.* "[T]he time needed for reflection is not necessarily prolonged, and the space of time between the intent [knowledge] to kill and the act of killing may be very short. It is the act of premeditation and not the length of time available that determines the question." *Id.* at 428-29 (internal quotation marks omitted).

wounds"), the testimony of Officer Wright, and Stanley's conduct after the shootings, as evidence "present[ing] challenges to a defense based on absence of premeditation." At trial, there was evidence that Stanley's wife was shot three times: once to the top of her head, with the barrel of the gun pressed against her skull; once in the upper lip, from a distance of less than one foot; and once behind the ear, from a distance of three or more feet. The evidence also indicated that his daughter was shot once: to the top of the head, with the barrel of the gun pressed against her skull. Officer Wright testified that Stanley said he shot his daughter "because she had seen what he had done." This evidence is sufficient to show a lack of prejudice to Stanley because the Hammitt interview would not have changed the outcome given the evidence of premeditation.

## C.   Ineffective Assistance of Counsel: Sentencing Phase

Stanley asserts that trial counsel was ineffective during the sentencing phase because he "failed to offer the wealth of mitigating evidence that was at his disposal." There appear to be two parts to this argument. First, Stanley contends that counsel failed to "call a single mental health expert to testify at sentencing, despite the fact that all of the experts . . . agreed that Stanley's mental capacities were impaired at the time of the crime," and failed to offer testimony "regarding Stanley's mental health, his low IQ, or to explain, from a scientific standpoint, how the drug and alcohol abuse could have affected his actions on the night of the crime."[6] Second, Stanley argues that trial counsel's failure to investigate the significance of the Hammitt interview or provide that information to the mental health experts constituted ineffective assistance of counsel.

_____

[6]Despite Stanley's argument on appeal, in the district court he confined his challenge to counsel's failure to offer the testimony of experts regarding his impairment due to substance abuse at the time of the offense. We limit our review to the issue raised in the district court. *See Gallego v. McDaniel*, 124 F.3d 1065, 1072 n.7 (9th Cir. 1997).

During the guilt phase, the experts' testimony focused on whether Stanley satisfied the legal standard of insanity, not on the broader effects of his substance abuse. Specifically, in his report to the court, Dr. Garcia-Bunuel stated that, "[h]ad [Stanley] not been under the influence of a combination of alcohol, marijuana and cocaine, the alleged crimes would not have been committed in that his ability to conform his conduct to the requirements of the law would have been very seriously impaired." At trial, Dr. Garcia-Bunuel testified that, "Defendant at the time of the commission of the alleged offense was under the influence of alcohol, marijuana, cocaine. He was not psychiatrically ill . . . [and] was able to appreciate the difference between right and wrong as applied to his actions." Similarly, Dr. Bindelglas concluded in his report to the court that, "[a]t the time of the offense . . . the defendant's ability to think clearly, reflect on the consequences of his actions and to control his activity were significantly impaired." Neither expert testified regarding the cumulative effect of substance abuse on Stanley. But while the expert testimony during the guilt phase was clearly limited in its scope, Stanley provides no evidence to suggest what additional testimony would have been given by the experts if called during the sentencing phase to explain the cumulative effects of Stanley's chronic substance abuse.

**[11]** Stanley argued in his state petition for post-conviction relief that trial counsel rendered ineffective assistance by failing to call mental health experts during the sentencing phase of trial. However, the state court did not address this issue.

**[12]** "[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (citations and footnote reference omitted). Nevertheless, because Stanley failed to present evidence to support his contention, other than the evidence presented at trial, he has failed to establish that counsel rendered ineffective assistance in failing to present evidence to explain the cumulative effects

of Stanley's chronic substance abuse. *See Cox v. Del Papa*, 542 F.3d 669, 681 (9th Cir. 2008) ("Without any specification of the mitigating evidence that counsel failed to unearth, [the petitioner's] claim must fail.") (citation omitted).

**[13]** Stanley has a stronger argument regarding use of the Hammitt interview as mitigation evidence during the sentencing phase. We pause for a moment to note our dissenting colleague's disturbing argument that the passage of time should somehow militate against habeas relief. *See Dissenting Opinion*, pp. 4175-76. Indeed, Stanley has met all deadlines in filing for post-conviction relief, including the restrictive AEDPA deadlines. After the Arizona Supreme Court affirmed Stanley's conviction in 1991, Stanley filed a preliminary petition for post-conviction relief in the trial court. The trial court took nearly five years to deny the petition even though it did not hold a hearing. Less than three weeks after the Arizona Supreme Court's denial of Stanley's state petition, Stanley filed his federal habeas petition. The district court took more than eight years to deny the petition. Stanley then promptly appealed to the Ninth Circuit. For the dissent to suggest that the lengthy process, none of it due to a lack of diligence on Stanley's part, is reason to deny him an evidentiary hearing violates every sense of fairness and justice. Moreover, the increasing frequency with which innocent people have been vindicated after years of imprisonment counsels a different approach. *See* Samuel R. Gross et al., *Exonerations in the United States 1989 through 2003*, 95 J. Crim. L. & Criminology 523, 523-24 (2004) (noting that from 1989 through 2003 exonerated individuals "spent more than 3,400 years in prison for crimes for which they should never have been convicted . . ."). We note this phenomenon, not to imply that Stanley is innocent, but to emphasize that it is never too late to correct an injustice.

**[14]** We also point out that because the district court addressed whether an evidentiary hearing was warranted, that issue is squarely presented on appeal. *See Sechrest v. Ignacio*,

549 F.3d 789, 810 n.10 (9th Cir. 2008). Finally, it is important to keep in mind that our decision in no way affects Stanley's conviction, and it may not affect his sentence. All this decision does is give Stanley the opportunity to establish whether his counsel's failure to fully inform the defense mental health experts undermines confidence in the sentence of death imposed. *See Strickland*, 466 U.S. at 694.

**[15]** On post-conviction review, the Superior Court of the State of Arizona held that trial counsel's decision to withhold the Hammitt interview was a reasonable tactical decision because "the possible harm to the defense which could be caused by use of Dr. Hammitt's interview outweighed the possible benefits the use of the interview might produce."[7] *State v. Stanley*, No. CR 11909, at 7 (Ariz. Super. Ct. May 19, 1997). The court concluded that, "with regard to the issue of sentencing, Dr. Hammitt's interview could have undermined the claim of a disassociative (sic) reaction . . ." *Id.* Without holding an evidentiary hearing or making any findings regarding the investigation underlying trial counsel's decision, the court found that "[Stanley's] determination not to waive the physician-client privilege was a matter of reasoned trial strategy and does not present a colorable claim that trial counsel was ineffective for failing to do so." *Id.*

**[16]** Where a petitioner has not failed to develop the factual basis of his claim in State court, as required by 28 U.S.C. § 2254(e)(2), an evidentiary hearing on a habeas corpus petition is required where the petitioner's allegations, if true, would entitle him to relief, and the petitioner has satisfied the requirements of *Townsend v. Sain*, 372 U.S. 293 (1963). *See Insyxiengmay v. Morgan*, 403 F.3d 657, 670 & n.6 (9th Cir. 2005). A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the

---

[7]The Superior Court rejected his claim on the merits, and the Arizona Supreme Court summarily denied review. Thus, the Superior Court's decision is the last reasoned decision of the state courts.

factual basis of his claim and therefore satisfies § 2254(e)(2).[8] *See Estrada v. Schribner*, 512 F.3d 1227, 1235 n.7 (9th Cir. 2008). Under *Townsend*, an evidentiary hearing is justified where, as here, "the material facts were not adequately developed at the state-court hearing." 372 U.S. at 313. Therefore, Stanley is entitled to an evidentiary hearing on his ineffective assistance claim if his allegations, if proved, would entitle him to federal habeas relief. *See Insyxiengmay*, 403 F.3d at 670. The standard we apply to determine whether the alleged facts would entitle Stanley to relief is the deferential standard of 28 U.S.C. § 2254. *See Estrada*, 512 F.3d at 1235.

[17] "It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999), *as amended*. The emphasis of the sentencing phase of trial is different than that of the guilt phase. *See id.* ("The determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts.") (citation omitted); *see also Wallace v. Stewart*, 184 F.3d 1112, 1117 n.5 (9th Cir. 1999) ("[T]he lawyer's burden might differ at the guilt phase from that at the penalty phase . . ."). Even where the sentencer is aware of facts underlying the defendant's mitigation case, trial counsel may not necessarily rest on these facts. *See Caro*, 165 F.3d at 1227 (clarifying that although the jury had information regarding the defendant's background, it did not "have the benefit of expert testimony to explain the ramifications of [this background] on Caro's behavior").

[18] Even if expert testimony regarding Stanley's mental state at the time of the crime would not have been admissible to challenge premeditation, as discussed above, it would have been admissible and highly relevant at sentencing. Evidence that might not rise to the level of defense of a crime may

---

[8] In his state petition for post-conviction relief, Stanley sought an evidentiary hearing. His petition was denied without a hearing.

nonetheless be important mitigating evidence. *See Frierson v. Woodford*, 463 F.3d 982, 993-94 & n.12 (9th Cir. 2006).

**[19]** In *Wallace*, we held that trial counsel has an affirmative duty to provide mental health experts with all information relevant to the formulation of their conclusions. *See Wallace*, 184 F.3d at 1117. "A lawyer who knows of but does not inform his expert witnesses about essential pieces of information going to the heart of the case for mitigation does not function as 'counsel' under the Sixth Amendment." *Id.* (citation and alteration omitted). Although trial counsel's lack of effectiveness was not prejudicial at the guilt phase, during sentencing, "where mitigation evidence may well be the key to avoiding the death penalty," our analysis differs. *Id.* (citation omitted). Indeed, if the district court were persuaded that rather than being a cold-blooded murderer, Stanley "snapped" and killed his wife and daughter, it is not at all unlikely that he could have avoided a death sentence. *See, e.g.*, *State v. Carlson*, 48 P.3d 1180, 1197-98 (Ariz. 2002) (en banc) (reducing a death penalty to life in prison without the possibility of parole based upon mitigating circumstances). As in *Wallace*, we conclude that Stanley "has made out a prima facie case" of ineffective assistance of counsel. *See Wallace*, 184 F.3d at 1118.

In the dissent's view "all that we are talking about" is supplementation of the defense experts' "testimony with Stanley's remark that 'he felt like he was watching' and like he wasn't really there.' " *Dissenting Opinion*, p. 4183. We beg to differ. Both defense experts agreed that the information regarding Stanley's apparent dissociative state would have completely changed their testimony in Stanley's favor and would have permitted a credible argument against the alleged depravity that is so prominent in our dissenting colleague's discussion.

To warrant habeas relief, Stanley is also required to demonstrate that he was prejudiced by counsel's failing. *See Strick-*

*land*, 466 U.S. at 687. Prejudice is established by a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Stanley need only show "a probability sufficient to undermine confidence in the outcome." *Id.* "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Stankewitz v. Woodford*, 365 F.3d 706, 723 (9th Cir. 2004) (citations omitted).

Stanley's death sentence was based on the following aggravating circumstances: (1) Stanley was convicted of one other homicide in connection with the killing of his daughter; (2) at the time of the murder, Stanley was an adult and his daughter was under 15 years of age; and (3) Stanley committed the murder of his daughter in a depraved manner. These were balanced against the following mitigating circumstances: (1) Stanley had no prior felony record; (2) he "was an adequate family man;" (3) he made attempts to address his drug and alcohol problems; (4) "he had exhibited very little violent behavior or spousal abuse;" and (5) he was "remorseful for his crimes." *Stanley*, 809 P.2d at 954. The court considered and rejected Stanley's assertion that "his capacity to appreciate the wrongfulness of his conduct or his ability to conform his conduct to the requirements of the law" was "significantly impaired" at the time of the killings. *Id.* at 956.

**[20]** The statements of Drs. Bindelglas and Garcia-Bunuel undermine confidence in the state court's balancing. First, they introduce additional residual doubt regarding Stanley's culpability for both killings by casting additional doubt on his premeditation. They also weigh against the court's finding that Stanley killed his daughter in a depraved manner, because they suggest that he was not in control at the time of the killings. In relation to the finding of depravity, a dissociative reaction would explain how Stanley could have been so intentional about concealing his wrongdoing after the killing, yet not have been intentional about the killing itself. Most signifi-

cantly, with the support of the Hammitt interview, the statement of the experts would have supported a finding that Stanley could not "conform his conduct to the requirements of the law." Therefore, we conclude that, if proved, Stanley's allegation would establish that he was prejudiced by trial counsel's failure to investigate and develop a mitigation case based on the Hammitt interview.

[21] We cannot agree with our dissenting colleague that defense counsel's failure to inform the mental health experts of Stanley's statements to Dr. Hammitt was a reasonable tactical decision at the sentencing phase of the trial. It was entirely reasonable to keep this evidence out at the guilt phase because Stanley was still challenging the admissibility of his confession and testimony regarding his statements to Dr. Hammitt would have established an independent admission of guilt. However, that consideration evaporated once Stanley was convicted. Moreover, because the admission of expert testimony regarding the mental state of the defendant at the time of the offense is barred in Arizona, any attempt to introduce the expert testimony during the guilt phase would have been futile. Just the opposite was true for the sentencing phase. That was the time for defense counsel to muster all available mitigation evidence. Testimony from the defense experts would have countered Dr. Hammitt's testimony on a two-to-one basis and explained how Stanley could have acted in such a depraved manner at the time of the killings.

[22] Because Stanley's allegation supported by expert testimony would entitle him to federal habeas relief, the district court abused its discretion in denying his petition without an evidentiary hearing. *See Wallace*, 184 F.3d at 1118 (remanding for an evidentiary hearing under similar circumstances).

## IV.

### *CONCLUSION*

[23] For the foregoing reasons, we AFFIRM the district court's denial of the petition for a writ of habeas corpus as to

the *Miranda* claim and as to the claim of ineffective assis-
tance during the guilt phase, and REVERSE the district
court's denial as to the claim of ineffective assistance during
the sentencing phase. We REMAND for an evidentiary hear-
ing on that claim. In so doing, we express no opinion as to the
ultimate merits of Stanley's petition.

**AFFIRMED in part, REVERSED in part, and
REMANDED.**

---

B. FLETCHER, Circuit Judge, concurring:

I concur in the majority opinion affirming the district
court's denial of the *Miranda* claim and the claim of ineffec-
tive assistance during the guilt phase, and its reversal of the
district court's denial of the claim of ineffective assistance
during the sentencing phase. I also concur in remanding for
an evidentiary hearing on that claim.

I write separately because I find an additional ground for
reversal of the district court's denial of the ineffective assis-
tance claim during the sentencing phase. Stanley has alleged
a colorable claim of ineffective assistance for the failure to
call mental health experts during sentencing. He argues that
competent counsel would have called mental health experts to
testify to two types of evidence: "Stanley's mental health, his
low IQ . . . [and] how the drug and alcohol abuse could have
affected his actions on the night of the crime." Such evidence,
properly presented, has a "reasonable probability" of affecting
the outcome of the sentencing proceeding. *Strickland v.
Washington*, 466 U.S. 668, 687 (1984). Thus, I would expand
the scope of the evidentiary hearing on remand to include
whether Stanley's constitutional right to effective assistance
of counsel was violated by his lawyer's failure to call any
mental health experts at sentencing.

The majority does not include this aspect of Stanley's appeal in its reversal for two reasons, each of which I will address in turn. First, the majority refuses to consider trial counsel's failure to present expert testimony on Stanley's general mental capacity because "in the district court he confined his challenge to counsel's failure to offer the testimony of experts regarding his impairment due to substance abuse at the time of the offense. We limit our review to the issue raised in the district court." Majority Op. 4164, n.6, citing *Gallego v. McDaniel*, 124 F.3d 1065, 1072 n.7 (9th Cir. 1997). But it was adequately raised. Stanley argued to the district court that his lawyers were ineffective in pursuing mitigation based on mental capacity. His Petition for Writ of Habeas Corpus stated that,

> In the sentencing hearing, trial counsel failed to call any of the mental health experts as witnesses. Furthermore, he failed cite [sic] the above conclusions of the experts in the sentencing hearing or argue that their reports established the existence of a statutory mitigating circumstance pursuant to ARS § 13-703(G)(1).

ARS § 13-703(G)(1) is not specific to drug abuse evidence, but pertains to mental incapacity in general: "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." The essence of Stanley's argument on appeal is that his lawyers should have presented the available evidence of impaired capacity, evidence of his low IQ, the head trauma he suffered as a child, and his chronic substance abuse from an early age. It is true that in his Petition to the district court, Stanley referred specifically to his lawyer's failure to present the mental health experts' conclusions regarding his substance abuse. However, the underlying claim — ineffective assistance based on failure to present expert witness testimony on impaired capacity (ARS § 13-703(G)(1)) — includes

more than just that one type of evidence, and was raised in the district court.

Moreover, even if I were to accept the majority's view on this issue, I would still find that justice requires us to include it in our review. Waiver, after all, is not a jurisdictional limitation, and we retain discretion to consider issues for the first time on appeal. *See, e.g., Myers v. Merrill Lynch & Co.*, 249 F.3d 1087, 1088 (9th Cir. 2001); *Telco Leasing, Inc. v. Transwestern Title Co.*, 630 F.2d 691, 693 (9th Cir. 1980). The state was not prejudiced in its ability to respond to this issue and vigorously argued it on appeal.

Second, the majority rejects Stanley's claim of ineffective assistance for failure to present evidence to explain the cumulative effects of Stanley's chronic substance abuse, because "he has failed to present evidence to support his contention, other than the evidence presented at trial." Majority Op. 4165, citing *Cox v. Del Papa*, 542 F.3d 669, 681 (9th Cir. 2008) ("Without any specification of the mitigating evidence that counsel failed to unearth, [the petitioner's] claim must fail.") (citation omitted). I disagree. Stanley has argued that his counsel provided ineffective assistance at sentencing because, "[a]lthough a few witnesses did testify very briefly about drug use, there was no testimony . . . to explain, from a scientific standpoint, how the drug and alcohol abuse could have affected his actions on the night of the crime." That is enough suggestion of "what additional testimony would have been given by the experts" to make out a colorable claim of prejudice and to entitle Stanley to a hearing on the matter. Majority Op. 4165. *See Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (as amended) (finding that although the jury had information on defendant's background, it did not "have the benefit of expert testimony to explain the ramifications of [this background] on Caro's behavior"); *Frierson v. Woodford*, 463 F.3d 982, 994 (9th Cir. 2006) ("The district court misapprehended the different purposes for the drug evidence at each phase of trial. Evidence of a history of chronic drug

abuse may not have been sufficient to demonstrate that [defendant] lacked the requisite mental state for the crime, but the extent of [defendant's] drug use from an early age was an important mitigating factor that the jury did not have an opportunity to consider.")

Therefore, while I concur in the majority opinion, I am compelled to set out these additional reasons for reversing the district court and remanding for an evidentiary hearing.

---

KLEINFELD, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's rejection of Stanley's claims that his confession was inadmissible, and that his lawyer rendered ineffective assistance in the guilt phase of his trial. I respectfully dissent from the majority's decision that Stanley is entitled to an evidentiary hearing on whether his lawyer rendered ineffective assistance in the penalty phase.

Federal evidentiary hearings on state habeas petitions are limited and discretionary.[1] This case shows one reason why. Murderers sentenced to death typically outlive many of the other participants at trial. Stanley murdered his wife and daughter in 1986 and the evidentiary hearing would take place, probably, in 2010, almost a quarter century later. Because the issue would be whether his lawyer rendered ineffective assistance, the focus would be on asking his lawyer what he did, what he did not do, and why he acted or refrained from acting as he did. That cannot happen, because Stanley's lawyer is dead. There is nothing unusual about a lawyer of the level of experience adequate to defend death penalty cases dying in the quarter century following trial, nor is there anything unusual about the decades between trial and

---

[1] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

a favorable appellate decision in a § 2254 habeas case.[2] If the lawyers are still alive, it is a stretch to pretend that they remember everything, even if they have retained their ancient notes. And in this case, even if he were alive, the lawyer's responses could not justify relief.[3]

In this case, Stanley did not even ask the district court to hold an evidentiary hearing on his claim. He had asked for one in state court, so no doubt made a considered decision not to request one in federal court, perhaps because he had no

---

[2]*See, e.g.*, *Sechrest v. Ignacio*, 549 F.3d 789 (9th Cir. 2008) (twenty-five years passed between state court conviction and grant of federal habeas relief); *Frierson v. Woodford*, 463 F.3d 982, 985 (9th Cir. 2006) (twenty-eight years passed between state court conviction and grant of federal habeas relief); *Landrigan v. Schriro*, 441 F.3d 638 (9th Cir. 2006) (eighteen years passed between state court conviction and grant of federal habeas relief), *rev'd*, 550 U.S. 465 (2007).

[3]The majority finds my comment about the passage of time "disturbing" because of "the increasing frequency with which innocent people have been vindicated after years of imprisonment." See *Majority Opinion* at 4166. I can think of few tasks more important than freeing innocent people who have been wrongly imprisoned. Stanley does not claim to be among the innocent. The majority does not suggest any possibility that he is innocent.

The delay matters here because the only issue is what may seem to be an unspoken rule in our circuit that anyone sentenced to death had ineffective assistance of counsel during the sentencing phase of his trial or at least needs an evidentiary hearing decades after sentencing to find out. See, e.g., *Pinholster v. Ayers*, 590 F.3d 651 (9th Cir. 2009) (en banc); *Belmontes v. Ayers*, 529 F.3d 834 (9th Cir. 2008), *reversed, Wong v. Belmontes*, 130 S.Ct. 383 (2009); *Landrigan v. Schriro,* 441 F.3d 638 (2006), *reversed*, *Schriro v. Landrigan*, 550 U.S. 456 (2007). My colleagues and I share a concern with getting accurate results from the courts to avoid wrongful imprisonment of the innocent. We also ought to share a concern with getting accurate and reliable results on whether lawyers rendered ineffective assistance, a task best accomplished when the lawyers who rendered the assistance are alive to explain what they did and why they did it. I do not suggest that the delay is Stanley's fault. My point is that the decades preceding an evidentiary hearing on what his lawyer did and why make the hearing unreliable where the lawyer cannot testify because he is dead.

useful evidence to present. The district court nevertheless considered granting such a hearing, and concluded "after reviewing the record, that none of Petitioner's claims warrants evidentiary development because the allegations, even if true, do not entitle Petitioner to habeas relief."[4] Yet somehow the majority concludes that the district court abused his discretion by not giving Stanley a hearing he did not ask for, and was not entitled to receive, at which findings would not entitle Stanley to relief. That is our error, not the district court's.[5]

## Facts

Stanley took his wife and two children for a ride, and murdered his wife and older child. He shot his wife dead with three shots, one to the left side of her head, one under her lips, one through the top of her head, with the muzzle planted on her skull.

And he murdered his five year old daughter. He put the muzzle of the gun on the top of her skull and pulled the trigger. The forensic pathologist testified that the shots Stanley fired through the tops of his wife's and his daughter's skulls were contact wounds, that is, the muzzle was touching their skulls.[6]

---

[4] *Stanley v. Schriro*, No. CV-98-0430, 2006 WL 2816541, at *33 (D. Ariz. Sept. 27, 2006).

[5] *See Landrigan*, 550 U.S. at 481 (reversing the Ninth Circuit and holding that a district court did not abuse its discretion in refusing to grant an evidentiary hearing to death row inmate where it determined that, even assuming the truth of all facts respondent sought to prove at the hearing, respondent was not entitled to federal habeas relief because the evidence respondent sought to introduce would not have changed the result).

[6] The majority opinion suggests that the heinous details of the two murders are immaterial to the merits of the legal issues. That argument is mistaken. The heinous details were why the judge sentenced Stanley to death. Our critical question is whether the trial judge would have sentenced Stanley to death if at the penalty phase the trial judge had heard Stanley's statements to Dr. Hammitt, as well as the opinion from two doctors,

Significantly, Stanley spared the baby. His eleven month old son was sitting next to his daughter, but Stanley did not shoot this child. The reason why affected his death sentence. Stanley shot his daughter because she otherwise might have testified against him, and spared his baby because the baby could not testify against him.

After he killed them, Stanley dumped his wife's and daughter's corpses by pulling over to the side of the road, carrying each body to the edge, and dumping it. Then he drove home, showered with his clothes on to wash out the blood, and drove his car to his father's repair shop to clean it out. He hid the bloody seat cover and blanket in the trash, but he missed a bloody sock. Then he took the baby, his wife's purse, and some groceries home, stopping off on the way for some beer.

At home, Stanley changed the baby's diaper, started a load of laundry, and put the baby to bed. Then he drove to a convenience store, rented a videotape, and set up a phony story. The store clerk remembered him because he rented one of the store's few "racy" videos. Stanley asked if the clerk had seen a woman and little girl earlier that evening. When the clerk said he hadn't seen them, Stanley remarked that his wife "must have gotten pissed off and taken off." This was after he had murdered them, dumped their bodies, and washed away their blood, so he knew perfectly well that his wife had not "taken off."

---

instead of one doctor, that Stanley had a dissociative reaction. The details of the murder of the daughter together with the sentencing judge's comments on that murder provide the answer. The trial judge had already heard testimony from one of these two doctors that Stanley had a dissociative reaction, and from the other doctor that Stanley might have had a dissociative reaction. Having heard this testimony, the trial judge nevertheless sentenced Stanley to death because of the close-range execution style of the killings, and because he killed his daughter in order to eliminate her as a witness to her mother's murder.

At around 11:30 pm, Stanley called his father and the police to report his wife and daughter "missing," continuing the deception he had begun with the convenience store clerk. He told them his wife and daughter went for a walk with the family dog around 10:45 p.m. and had not returned. Stanley's family and the police began searching the neighborhood.

The phony "must have gotten pissed off and taken off" story fell apart the next day, when police found the bloody blanket and seat cover at the repair shop. The police brought Stanley in, and he confessed. Asked why he shot his daughter but not the baby, Stanley said it was "because she [the daughter] had seen what he had done," but the baby "could not tell anybody what he had done." In Stanley's VCR, the police found the videotape the convenience store had described, stopped partway through.

The morning after his arrest, Stanley spoke with the jail psychiatrist, Karleen B. Hammitt, M.D. Dr. Hammitt concluded that Stanley was not insane, not psychotic, not even remorseful. Stanley told her that "he flew off the wall and shot them," and "realized right away what he had done." He also said that he felt "like he was watching and like he wasn't really there" during the murders. Stanley denied ever having heard voices (i.e. no auditory hallucinations, tending to rule out psychosis). Dr. Hammitt said Stanley "never volunteered any comments about remorse or, you know, if I had just done this or that differently or gotten treatment for my drinking problem or done anything different," during his meetings with her. Although Stanley cried a great deal during their initial meeting (48 hours after the murders), Dr. Hammitt told the defense investigator that "[n]othing [Stanley] said indicated to me any degree of remorse per se."[7]

---

[7]The majority opinion suggests that Dr. Hammitt's statements that "[n]othing [Stanley] said indicated to me any degree of remorse per se" and that he "never volunteered any comments about remorse" are "a far cry from a definitive statement that Stanley lacked remorse." *See Majority*

Stanley was charged with first degree murder for the deaths of his wife and daughter. During the guilt phase of his trial, Stanley sought to avoid conviction for first degree murder by arguing that: (1) the police conducted a sloppy investigation resulting in only circumstantial evidence; (2) the police coerced Stanley's confession; (3) Stanley lacked the capacity to premeditate or deliberate, having been too high and too drunk at the time to form the requisite intent; and (4) Stanley met the legal test for insanity. In support, the defense called two mental health experts. One thought Stanley had suffered a "dissociative reaction" and may have met the M'Naughten test for insanity at the time of the murders. The other thought a dissociative reaction was "unlikely," but could not rule it out.

The jury nevertheless convicted Stanley of first degree murder for the deaths of his wife and five-year-old daughter. After reviewing the entire file and all the testimony, the judge imposed a sentence of life imprisonment for the murder of Stanley's wife. The judge imposed a sentence of death for the murder of Stanley's five-year-old daughter.[8]

The judge based his decision to sentence Stanley to death for the murder of his five-year-old daughter (not his wife) on

---

*Opinion* at 4155. The majority evidently would infer remorse despite what Dr. Hammitt said, because Stanley cried. I read Dr. Hammitt as taking special note that Stanley did not say a word indicating that he was remorseful. As for his crying, that could be for his wife and daughter, whom he had murdered, or himself, and Dr. Hammitt's discussion appears to have meant to the sentencing judge that Stanley was not crying out of remorse for murdering his wife and daughter.

[8]In 1986 when Stanley was sentenced to death, Arizona death sentences were imposed by the judge, not the jury. The Supreme Court held in *Ring v. Arizona* that the Constitution precludes that procedure. 536 U.S. 584 (2002). The Court subsequently decided that *Ring* does not apply retroactively to cases such as this one where the convictions and sentences were final when *Ring* was decided. *Schriro v. Summerlin*, 542 U.S. 348 (2004).

a combination of aggravating circumstances: (1) Stanley killed his daughter because she had witnessed him murder her mother and could tell what she had seen; (2) Stanley did not kill the baby because the baby was too young to talk about what he had seen; (3) the execution-style contact wound on Stanley's daughter's skull; (4) the brutality and senselessness inherent in killing one's own family; (5) the testimony of the video store clerk indicating that Stanley did not appear to be under the influence of alcohol or drugs; and (6) the type of video Stanley rented shortly after hiding the evidence of his brutal crime. From this evidence, the judge concluded that Stanley's decision to kill his daughter was the product of an intelligent, rational calculation, and showed the requisite heinousness and depravity to impose a death sentence. Here is the sentencing judge's explanation:

> The Court will first note that it is convinced beyond a reasonable doubt that Defendant did state that he had killed his daughter because she had seen what he had done and that his son was too young to talk about what he had seen. The Court is likewise convinced beyond a reasonable doubt that when Defendant made these statements to the officers they were made entirely voluntarily and is further convinced beyond a reasonable doubt that these statements reflect the true state of mind of Defendant at the time of these murders. . . . .

> When Defendant's statements are considered together with Dr. Keen's testimony that the shooting of Susan Stanley was accomplished at very close range, including one contact wound, and the shooting of Selest Stanley was with a single hard contact wound, the Court has concluded that Defendant deliberately excluded Chad from any danger based on his intelligent and rational conclusion that Chad could not relate to anyone what Defendant had done. . . .

Heinousness and depravity involve the killer's mental state and attitude at the time of the killing. In *State v. Gretzler*, 135 Ariz. 42 (1983), our Supreme Court set forth a list of specific factors which could lead to a finding of heinousness or depravity. These factors included the senselessness of the crime and the helplessness of the victim. In addition, our Court in *State v. Gillies*, 142 Ariz. 564 (1984) stated that elimination of a witness as a motive for murder also illustrates heinousness and depravity.

Addressing first the motive for the killing, as noted above, the Court is convinced beyond a reasonable doubt that Defendant murdered Selest to eliminate her as a witness.

Addressing next the senselessness of the crime and helplessness of the victim, instructive in this regard is the recent case of *State v. Wallace*, 151 Ariz. 362 (1986). Here the Defendant brutally murdered a mother and her two children. As noted by the Supreme Court, Defendant committed these acts despite the fact that he claimed to have loved these people and that he had lived with them as a family for more than two years. Focusing in specifically on the children, the Court stated:

> "Moreover, the fact that Defendant killed two children, with whom he admittedly had no dispute and who posed no danger to him is additional evidence of his 'shockingly evil state of mind.' (Citation omitted) We therefore find that the statutory aggravating factor of heinous and depraved is present in the instant case." 151 Ariz. at page 368.

Finally bearing on Defendant's state of mind is the videotape testified to. According to the testimony of

Mr. Cook, within just a short time after the killings, disposal of the bodies and attempts to hide evidence, Defendant was at Mr. Cook's place of business to rent a "racy" videotape, identified by Officer Saravo later as entitled "Best of Anything Goes", a video dealing with a strip game show. Defendant did not appear to be under the influence of alcohol or any drug at the time he rented this videotape and apparently some time in the next twenty-four hours before he was arrested had watched part of it.

When these factors are considered together, they paint the picture of a man so depraved that he could kill his helpless 5 year old child, who was completely dependent on him and trusting of his goodwill toward her, kill her for no reason other than to eliminate her as a witness, and then, after rolling her body down a mountainside, sought to idle away his time by indulging himself in watching a strip game show. Beyond a reasonable doubt, the State has proven that Defendant committed the murder of Selest Dawn Stanley in an especially depraved manner.

As is plain from the judge's remarks, he viewed Stanley's murder of his daughter as a cold-blooded execution of a witness to keep her from talking, and that was the most central fact on the judge's mind in passing sentence. That would not have changed if the defense experts had supplemented their mental state testimony with Stanley's remark that "he felt like he was watching and like he wasn't really there." And that is all that we are talking about.[9] We lack authority to substitute

---

[9]The majority suggests that my view minimizes the effect of Stanley's remark on the penalty phase of the trial. *Majority Opinion* at 4169. Rather, I believe that the majority mischaracterizes the effect of the remarks on the defense experts' positions by saying that this information "would have completely changed their testimony in Stanley's favor[.]" *Majority Opinion* at 4169. Dr. Bindleglass states that he would have testified that Stanley

our view for the state sentencing judge's on whether Stanley should be executed for murdering his daughter.

## Analysis.

### I.    Standard of review.

The district court had discretion, bounded by standards, whether to grant an evidentiary hearing. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."[10] Under AEDPA, the district court's deference was also bounded by the deference it owed to the state court,[11] and our review is bounded by the additional deference we owe to the district court.[12] We have no warrant to jump over this triple deference.

---

had a dissociative reaction, but that was already his position at trial. Dr. Bunuel states that he would have opined that Stanley had a dissociative reaction, as opposed to his position at trial that Stanley might have had a dissociative reaction. The state superior court judge, not Dr. Bindleglass or Dr. Bunuel, had sentencing responsibility. It is clear from the sentencing judge's remarks that Dr. Bunuel's change from "might have had" to "did have" a dissociative reaction would not have changed the sentencing judge's mind. The sentencing judge commented on various aspects of the evidence, but not this one. His explanation for the sentence focused on murder of Stanley's helpless child because she might otherwise be a witness, not on the psychological underpinnings of Stanley's conduct. The trial judge was thus already presented with defense expert testimony regarding the dissociative reaction theory, and nevertheless sentenced him to death for the reasons discussed at length above. Moreover, we cannot only consider how Dr. Hammitt's statements might have been favorable to Stanley in the sentencing phase, but also how Dr. Hammitt's statements may have had hurt Stanley in the sentencing phase as well.

[10]*Landrigan*, 550 U.S. at 474.

[11]*See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000).

[12]*Landrigan*, 550 U.S. at 468, 481 (reviewing for abuse of discretion the district court's decision not to grant an evidentiary hearing).

As the majority correctly points out, habeas relief for ineffective assistance requires two things: deficient performance by the attorney under the *Strickland v. Washington* standard, and prejudice.[13] Ineffective assistance of counsel in violation of the Sixth Amendment is representation that falls "below an objective standard of reasonableness" in light of "prevailing professional norms" at the time of the representation.[14] Counsel's actions are reviewed with a " 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."[15] The Supreme Court has stated that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."[16]

Deficient performance by the attorney is not enough, however, to establish a Sixth Amendment violation. The petitioner must also establish that he was prejudiced by the attorney's deficient performance. The prejudice standard is "a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceedings might have been different."[17] *Wong v. Belmontes*[18] holds that we cannot consider merely the best evidence the defense might have presented, but instead must consider *all* of the evidence that would have come into a penalty phase of a trial (both mitigating and aggravating) if the lawyer had made a different choice.[19]

---

[13] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

[14] *Id.* at 686; *see also Bobby v. Van Hook*, 130 S.Ct. 13, 16 -17 (2009).

[15] *Bell v. Cone*, 535 U.S. 685, 702 (2002) (quoting *Strickland*, 466 U.S. at 689).

[16] *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (quoting *Strickland*, 466 U.S. at 690).

[17] *Wong v. Belmontes,* 130 S.Ct. 383, 386 (2009) (quoting *Strickland*, 466 U.S. at 693).

[18] 130 S.Ct. 383 (2009).

[19] *Id.* at 386.

Thus, to reverse, we have to conclude that (1) Stanley's lawyer's conduct in not showing his expert witnesses the notes of what the jail psychiatrist said (Stanley's "felt like he was watching" remark) fell below an objective standard of reasonableness, almost impossible since it was strategic; (2) the judge might have sentenced Stanley to life imprisonment instead of death had he heard Stanley's experts testify after they had been informed by the jail psychiatrist's observations; (3) the state court's decision to the contrary was not merely incorrect but went beyond error to being "objectively unreasonable;"[20] (4) even though Stanley's habeas lawyer did not ask for an evidentiary hearing, the district judge abused his discretion by not conducting one anyway to determine whether the state court's ineffective assistance decision was objectively unreasonable. The record does not support a single one of these requirements for reversal.

## II.    Deficient performance.

Because "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,"[21] the state court cannot fairly be said to have unreasonably applied *Strickland* in determining that Stanley's lawyer's decision fell below "the wide range of reasonable professional assistance[.]"[22]

There is no claim that Stanley's lawyer failed to investigate, or failed to discover, some sort of available psychological or psychiatric evidence. Stanley's theory is that, knowing full well just what the jail psychiatrist had observed, his lawyer should have provided the jail psychiatrist's notes and the transcript of his own investigator's interview with the jail psy-

---

[20]*Williams*, 529 U.S. at 409-10; *see also Woodford v. Viscotti*, 537 U.S. 19, 22 (2003).

[21]Knowles, 129 S. Ct. at 1420 (quoting *Strickland*, 466 U.S. at 690).

[22]*Strickland*, 466 U.S. at 689.

chiatrist to the two witnesses who testified for the defense about Stanley's mental condition.

The first question to be answered, applying *Strickland* to this case, is whether not providing the notes was strategic, because "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."[23] The record admits of but one answer, yes. Stanley's lawyer made an in limine motion to keep the jail psychiatrist's evidence out of the trial, on the ground that it was protected by the physician-patient privilege. The prosecution wanted her to testify, and the defense did not. Stanley prevailed in keeping her out. As the state court observed,[24] he did so for the purpose of keeping the jury from hearing her unfavorable opinion that Stanley was neither psychotic nor remorseful.

The state court reasonably concluded that if Stanley had disclosed Dr. Hammit's interview or notes to third parties (the defense experts), Stanley would have waived the physician-patient privilege and could not have later successfully reasserted it.[25] Thus the jail psychiatrist could have testified. In addition, her opinion that Stanley was not psychotic and showed no remorse could have been brought out by prosecution cross examination of Stanley's own experts.[26] He would have obtained one very bad prosecution witness and compro-

---

[23]*Knowles,* 129 S. Ct. at 1420 (quoting *Strickland,* 466 U.S. at 690).

[24]*State v. Stanley*, No. CR 11909, at *7 (Ariz. Superior Ct. Yavapai County May 20, 1997) (order denying state habeas petition).

[25]*See State v. Mincey*, 687 P.2d 1180, 1194 (Ariz. 1984).

[26]Ariz. R. Evid. 705 ("The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."); *State v. Hummert*, 188 Ariz. 119, 126, 933 P.2d 1187, 1194 (Ariz. 1997) ("It is well established in Arizona that the basis for an expert's opinion is fair game during cross-examination.").

mised his own two witnesses, had he disclosed the jail psychiatrist's information to his own witnesses.

Dr. Hammit's statements are devastating to Stanley's case. Dr. Bindleglass testified for the defense that Stanley suffered a dissociative reaction, resulting in such marked impairment that Stanley was "truly incompetent" at the time of the murders. Dr. Bunuel testified that Stanley showed remorse, and may have suffered a dissociative reaction. The jail psychiatrist, who saw Stanley the morning after he was arrested, came to the opposite conclusions. She told the defense investigator that Stanley suffered from depression and she had advised the jail authorities to consider him at risk for self harm. Stanley told her that his wife had been yelling at him about his drinking, he flew off the wall, and he realized immediately what he had done. He had never heard voices, and she "found no indicators of psychotic thought process." "There were no non sequiturs in his speech," nothing "really off the wall" or "unrelated to what we were talking about," "really nothing to make me think that there was a psychotic process going on." Additionally, she noted that Stanley "never volunteered any comments about remorse."

The single remark by Dr. Hammitt that the majority thinks would have turned the whole case around had Stanley's lawyer disclosed it to the defense experts was "he said it was like he was watching and like he wasn't even there." Asked if she thought that indicated psychosis, Dr. Hammitt said: "No. I thought it probably had something to with whatever state of intoxication he was involved in at the time as well as the fact that most people don't ever believe that they themselves are going to be in the situation like he found himself in when he sobered up." Thus Dr. Hammitt rejected the defense experts' conclusion that this comment was evidence of a dissociative reaction. Dr. Hammitt considered the statement "within the continuum of things that are experienced by a person who is intoxicated."

It is hard to imagine a reason why, if he could keep this devastating evidence out, defense counsel would not do so. And he did. Before trial, defense counsel filed a motion in limine to exclude "the entirety of testimony, notes, materials, and reports secured, prepared, utilized and/or including the actual presence of" Dr. Hammitt, "in any aspect whatsoever of the case concerning Milo Stanley" based on the patient-physician privilege.

Before the penalty phase, defense counsel reminded the court of his successful in limine motion and moved to strike references to Dr. Hammitt's opinion from the presentence report. Thus keeping it out at sentencing was also a considered decision, not an oversight. The court granted the defense request. It then ordered both parties to refrain from citing or referring to Dr. Hammitt during the penalty phase. Dr. Hammitt's evidence, had defense counsel not succeeded in getting it stricken, would have tended to establish absence of remorse, absence of psychosis, and absence of "dissociative reaction" beyond what normal people have when they realize they have put themselves in a terrible situation.

Because the "possible harm to the defense which could [have been] caused by use of Dr. Hammitt's interview outweighed the possible benefits the use of the interview might produce," the state court concluded that counsel's "determination not to waive the physician-client privilege was a matter of reasoned trial strategy and does not present a colorable claim that trial counsel was ineffective for failing to do so." It further found that Dr. Hammit's interview "could have undermined the [defense's] claim of dissociative reaction." This is a sound application of the *Strickland* principle that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."[27]

---

[27]*Knowles,* 129 S. Ct. at 1420 (quoting *Strickland,* 466 U.S. at 690).

Capable lawyers evaluate not only what they ought to do, but what they ought not to do. Where action on behalf of a client has a considerable likelihood of backfiring, they avoid it.[28] Just as lawyers have no duty to pursue defenses likely to fail,[29] and no duty to pursue investigations likely to be "fruitless or even harmful,"[30] they have no duty to inject evidence likely to open the door to additional evidence that would be harmful. Much of the strategic thinking a good lawyer does during a trial is about whether something helpful he would like to put in will open the door to something harmful his adversary will then be able to inject. Decisions not to open the door are "sound tactical reasons" for not calling a witness or presenting certain evidence.[31] Had Stanley's attorney disclosed what Dr. Hammitt had said to his expert witnesses, he would have opened the door to devastating rebuttal testimony by Dr. Hammitt. His strategic decision not to do so is "virtually unchallengeable"[32] and, far from the state court's rejection of his deficient performance claim being unreasonable, it is our own majority opinion that unreasonably applies *Strickland*.

---

[28]*Cf. Osborne v. State,* 110 P.3d 986, 991 (Alaska App. 2005) (holding that where defense counsel believed client was guilty and there was a substantial risk that test would prove the prosecution's case, counsel's decision not to obtain highly discriminating DNA test was not ineffective assistance of counsel under Alaska law) (discussed in *District Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S.Ct. 2308, 2314 (2009)).

[29]*Knowles*, 129 S. Ct. at 1420-22; *see also Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994).

[30]*Burger v. Kemp*, 483 U.S. 776, 795 (1987) (quoting *Strickland*, 466 U.S. at 691).

[31]*See Bell*, 535 U.S. at 700-01; *see also Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) (holding that when mitigating evidence is "not especially helpful" and "would open the door to damaging rebuttal evidence," it is reasonable for counsel to decide not to present it).

[32]*Knowles,* 129 S. Ct. at 1420 (quoting *Strickland*, 466 U.S. at 690).

## III.   Prejudice.

Even if we pretend that any reasonable lawyer would have educated his experts with Dr. Hammitt's devastating opinion and opened the door to it at sentencing, Stanley would still have to surmount the impossible hurdle of showing that the sentence might have been different had he done so. That would require a record different from what we have, perhaps a sentencing judge who had said "if only I had seen some evidence that Stanley had a drinking problem or a fight with his wife or was depressed, then I would not sentence him to death for the murder of his little girl to keep her from talking." Stanley's argument seems to be that, had his experts known that he told the jail psychiatrist that he flew off the handle when his wife criticized his drinking, and felt "like he was watching and like he wasn't really there," his own experts might have persuaded the judge that he murdered his daughter because of a mental defect, even though the judge would also have known that Dr. Hammitt thought Stanley was remorseless, mentally normal except for depression, and not psychotic.

That is not a plausible possibility, in light of what the sentencing judge said. He decided to give Stanley the benefit of the doubt on whether he had any remorse, and considered remorse as a mitigating factor (persuasive for the murder of Stanley's wife), but Dr. Hammitt's evidence would have made that less likely. Stanley's problem establishing prejudice is that even if his own expert witnesses would have testified differently, the sentencing decision was not theirs to make, so improving their testimony but not the judge's decision would be fruitless. It is not enough for the petitioner to show that counsel's error had "some conceivable effect on the outcome."[33] Stanley must show "a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceedings might have been different."[34] The sentencing judge's remarks demonstrate that the outcome would have been the same.

---

[33]*Strickland*, 466 U.S. at 694 (emphasis added).

[34]*Id.* at 693.

The sentencing judge was "convinced beyond a reasonable doubt that Defendant did state that he had killed his daughter because she had seen what he had done and that his son was too young to talk about what he had seen." Together with his five year old daughter's helplessness and the contact of Stanley's gun's muzzle with the top of her skull, he concluded that her murder was extremely heinous and depraved. Throwing the dead bodies of his wife and child and renting the "racy" videotape shortly afterwards contributed to this evaluation. Based on the convenience store clerk's testimony as well as the other facts, the judge did not think Stanley was too drunk to know what he was doing. Stanley got his death sentence because of what he did to his daughter. Disclosure of what he told the jail psychiatrist to his defense experts would not have changed what Stanley did, and what he did persuaded the judge to impose a death sentence.

## Conclusion

An evidentiary hearing on whether Stanley's lawyer rendered ineffective assistance in this case is going to be a very odd proceeding. Because Stanley's lawyer is dead, he cannot be asked to fall on his sword and testify about what a bad lawyer he was for not giving Dr. Hammitt's notes and interview to his expert witnesses. Habeas counsel may be able to produce an expert witness to testify that any competent lawyer would have done so, and will be able to have his two experts testify in accord with what they say in their affidavits, that it would have made a difference to what they said. But even in the unlikely event that all this persuades the district judge that Stanley's lawyer did so bad a job that it was deficient despite being strategic, such a finding would be of no significance, because prejudice cannot be established. We already know the answer about whether the lawyer's putatively deficient performance might have made a difference, because the record establishes that the judge sentenced Stanley to death for executing his daughter to keep her from talking. We do not have a legal justification for doing anything but affirming, because

established habeas law precludes the federal courts from granting a writ against this state sentence.